JORDAN LAW GROUP
PATRICK W. JORDAN (Bar No. 52115)
pwj@pjordanlaw.com
1010 "B" Street, Suite 320
San Rafael, California 94901
Telephone: (415) 459-9865
Fax: (415) 459-9871

Attorneys for Plaintiff
MEDIC AMBULANCE SERVICE INC.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| MEDIC AMBULANCE SERVICE INC., | Case No. |
| Plaintiff, | **PETITION TO VACATE ARBITRATION AWARD** |
| v. | |
| UNITED EMS WORKERS, AFSCME LOCAL 4911, | |
| Defendant. | |

Plaintiff MEDIC AMBULANCE SERVICE INC ("Plaintiff" or "Medic") alleges:

### JURISDICTION

1.      This is an action to vacate the June 11, 2017 Decision and Award of Arbitrator Portia K. Igarashi issued under a collective bargaining agreement between an employer and a labor organization.  Jurisdiction is conferred upon this Court by Section 301 of the Labor Management Relations Act, as amended ("LMRA"), 29 U.S.C. § 185 through 28 U.S.C. § 1337(a) (action arising under federal law regulating commerce).

### VENUE

2.      Venue is proper in this District under 28 U.S.C. §§ 84(b) and 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

1

**PETITION TO VACATE ARBITRATION AWARD**

1

### INTRADISTRICT VENUE

2

3.     This case should be assigned to the Sacramento Division in that a substantial part

3

of the events or omissions giving rise to the claims for relief occurred in Solano County.  Eastern

4

District Local Rule 120.

5

### PARTIES

6

7

4.     Plaintiff is, and at all times material hereto was, an employer engaged in

8

commerce and in an industry affecting commerce as defined in 29 U.S.C. § 1421(1) and (3) and

9

29 U.S.C. § 152(2), (6) and (7), and within the meaning of Section 301.

10

5.     UNITED EMS WORKERS, AFSCME LOCAL 4911 ("Union" or "Defendant")

11

is, and at all times material hereto was, a voluntary unincorporated association and labor union

12

organized and existing under the laws of the State of California, with its principal place of

13

14

business located at 7275 National Dr., Unit F, Livermore, CA 94550

15

6.     Defendant is a labor organization within the meaning of Section 2(5) of the

16

National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(5), and a labor organization

17

representing employees in an industry affecting commerce within the meaning of Section 301.  At

18

all times material hereto, Local 4911 acted as a labor organization representing certain of

19

Plaintiff's employees at its Solano, California facility.

20

21

### THE COLLECTIVE BARGAINING AGREEMENT IN ISSUE

22

7.     Medic and Union are parties to a written collective bargaining agreement that

23

commenced on April 16, 2014 (the "Collective Bargaining Agreement").  (A true and correct

24

copy of the Collective Bargaining Agreement is attached hereto as **Exhibit A**.)

25

8.     The Collective Bargaining Agreement contains the following provisions, among

26

others:

27

28

PETITION TO VACATE ARBITRATION AWARD

**5.1 Grievance Procedure**

    A. The purpose of the grievance procedure is to facilitate a timely means of adjustment by the Employer and the Union following a prompt investigation and thorough discussion of any dispute arising from the interpretation or application of any terms of this agreement and/or disputes concerning working conditions, benefits, or wages.

    B. Employees should attempt to resolve problems with their immediate supervisor prior to resorting to the grievance procedure. **Any agreement reached between a supervisor and an employee shall not be considered to be a precedent setting agreement,** with a copy provided to the Union at the time of settlement. No agreement between supervisor and employee shall in any way conflict with the terms and provisions of this Agreement. **[Emphasis Added]**

**Grievance Procedure Outline**

**Step One**

The Employee or the Union through its steward shall submit the Grievance in writing to the Administrator or VP of Operations (VPO) within ten (10) business days of the occurrence giving rise to the grievance. Within ten (10) business days of receipt of the grievance notice, a Step 1 meeting shall be scheduled. The Administrator or VPO will give his/her answer in writing within ten (10) business days after such meeting. **Grievances resolved at this step shall not be precedent setting. [Emphasis Added]**

"Occurrence" is the date when the grievant learned of the event that is subject of the grievance or the effective date of discipline or discharge.

"Meeting" shall be defined as either an in person meeting, or if mutually agreeable, via telephone conference.

**StepTwo**

If the procedure in Step One fails to resolve the grievance then, the grievance shall be submitted to the President or his/her designee within five (5) business days of receipt of the Step One denial, the parties shall schedule a meeting within five (5) business days. The President or his/her designee shall respond, in writing, within five (5) business days from the date of the Step 2 meeting.

PETITION TO VACATE ARBITRATION AWARD

**Step Three**

In case of failure of the parties to settle the grievance at Step Two the Union shall be entitled to request that the grievance be referred to arbitration or Federal Mediator within five (5) business days from the Unions receipt of the Employer's Step Two response and shall request a list of seven (7) arbitrators from the Federal Mediation and Conciliation Service (FMCS). Within ten (10) calendar days from the receipt of the list from FMCS, the parties shall select an arbitrator by the process of alternately striking names from such list. The party to strike such names shall be on a rotating basis. The arbitrator's decision shall be final and binding on the Employer, the Union, and the employee(s) involved. The cost of the arbitration shall be divided equally; the costs include the arbitrator's fees and expenses, hearing room cost, and the cost of a transcript.

**The arbitrator or Federal Mediator shall have no power to add to, or subtract from, or otherwise modify any provision of this Agreement. [Emphasis Added]**

**5.2 Time Limits**

By mutual agreement between the Union and the Employer, the time limits of any step of the grievance procedure may be extended and this extension must be confirmed in writing within the specified time limits, **In the event either party fails to respond to the grievance within the time limits specified, the grievance shall be resolved on the basis of the opposing party's last stated position without setting precedent. [Emphasis Added]**

**10.10. Mandatory Assignment of Overtime**

A.    **Mandatory shifts**

1.    When the Employer is unable to fill an available shift through any other means other than a mandatory assignment to an Employee, Mandatory Assignments will be made in reverse seniority order. Employees will be given a minimum of seventy two (72) hours notice prior to mandatory shift. The Employer shall continue to strive to fill the mandated shift up to twelve (12) hours prior to the start of the shift requiring mandation. In the event the Employer is successful in filling the shift the Employer shall immediately communicate with the mandated employee and not require the employee to work the mandated shift.

2.    When a Mandatory shift has been assigned, the Employee will be moved to the bottom of the list. If an Employee refuses to accept a mandatory shift assignment they will be subject to the

4

PETITION TO VACATE ARBITRATION AWARD

following progressive discipline 1st offense=Written Warning 1st 2nd offense=one (1) day suspension, 3rd offense=Termination.

    3.    A continuing database of employees assigned mandatory shifts will be maintained by the Employer and available for review at all times, to ensure reverse seniority is maintained by assignment with the following guidelines:

    i.    No employee will be mandatoried more than one shift per two consecutive pay period block of time.

**11.6  Filling Open Shifts**

    A.    Available hours/shifts shall be defined as those **hours/shifts**, which are open. Available hours filled as follows:

    1.    Part-time employees;

    2.    Full-time employees on the available list by seniority;

    3.    Any employee willing to accept the shift;

    4.    Any means available to the Employer (i.e., non-bargaining unit management personnel);

    5.    Mandatory call back in reversed order of seniority.

    **[EMPHASIS ADDED]**

**25.3  Modifications to the Agreement**

    No addition to, alteration, modification, or waiver of any term, provision, covenant of condition or restriction in this agreement shall be valid, binding or of any force or effect unless mutually agreed to, in writing, by the Employer and the Union.

**25.4  Complete Agreement**

    This Agreement sets forth the parties' agreement and understanding with respect to the matters referred to herein. The parties acknowledge that during the negotiations which resulted in this Agreement, each party had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.

## STATEMENT OF CLAIM

    9.    Paragraphs 1 through 8 are incorporated by reference as though fully set forth herein.

    10.    Medic is the exclusive provider of emergency medical transportation for Solano County, excluding Vacaville.

PETITION TO VACATE ARBITRATION AWARD

11.     Union represents the paramedics and emergency medical technicians employed by Medic.

12.     On or about April 15, 2016, Union filed a grievance alleging:

> The Employer needs to follow the CBA when assigning Mandatory Shifts.  On 4/1/16 it became evident the Employer decided to unilaterally implement a new interpretation of the applicable CBA article 10.10 for Mandatory Shifts, as well as the way in which the Shift is assigned/handed out, while also not allowing for found coverage, or another individual the opportunity to voluntarily bid on the Shift mandated to another employee.

13.     Pursuant to the parties' Collective Bargaining Agreement the grievance was submitted to binding arbitration before Arbitrator Portia Igarashi on November 21, 2016 and February 17, 2017.

14.     Arbitrator Igarashi in a written decision and award dated June 11, 2017 found:

> (1) The Employer failed to comply with the grievance procedure in the CBA by failing to meet the time limits of Step 2 of the grievance procedure and then by failing to resolve the grievance based on the Union's last stated position.
> … (A true and correct copy of the June 11, 2017 Decision is attached hereto as **Exhibit B** at p.9.)

15.     After finding the timing violation in Paragraph 14, the Arbitrator should have followed the language of Section 5.2 of the CBA stating, "the grievance shall be resolved on the basis of the opposing party's last stated position without setting precedent."

16.     The Arbitrator ignored the language of Section 5.2 and exceeded her authority by issuing the following decision:

> The Union's Grievance is GRANTED.
> The Employer is ORDERED
> 1.      To cease and desist from any further violations of the CBA in the manners described above.
> 2.      To include shift identifiers in emails notifying employees of mandated shifts.  And,
> 3.      To send a clarifying memorandum to all bargaining unit members notifying them that the Employer will resume including shift identifiers in emails notifying employees of mandated shifts.

6

PETITION TO VACATE ARBITRATION AWARD

(See **Exhibit B** p. 16-17)

17.    The Employer and Union agreed to limit the Arbitrator's ability to fashion such remedies with Section 5.1 of the CBA that states, "The arbitrator or Federal Mediator shall have no power to add to, or subtract from, or otherwise modify any provision of this Agreement."

18.    By finding a timing problem with the grievance procedure and by setting precedent in violation of Section 5.2, the Arbitrator's award does not draw its essence from the CBA.

19.    By subtracting the "without setting precedent" language from Section 5.2 in violation of Section 5.1, the Arbitrator's award does not draw its essence form the CBA .

20.    The Arbitrator further found:

> The Employer violated the CBA and established past practice by eliminating shift identifiers from emails informing employees of mandated shifts.  (See **Exhibit B** p. 16)

21.    By finding a past practice of only using shift identifiers in email notifications of mandated shifts and ordering Medic to resume such, the Arbitrator has modified or waived the language in Section 11.6 allowing for mandation of "hours/shifts."

22.    Section 25.3 provides that a modification or waiver of the agreement requires a signed writing by both parties.

23.    By using past practice to both modify and subtract the "hours" portion out of the "hours/shifts" language of Section 11.6 in violation of the express language of Sections 5.1 and 25.3, the Arbitrator's award does not draw its essence form the Contract.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays as follows:

1.    That the Court declare under the terms of the Collective Bargaining Agreement that the June 11, 2017 Decision and Award of Arbitrator Portia Igarashi does not draw its essence

7

**PETITION TO VACATE ARBITRATION AWARD**

from the Collective Bargaining Agreement;

        2.      That the Court order that the June 11, 2017 Decision and Award be vacated;

        3.      That the Court order that the June 11, 2017 Decision and Award be non-precedent setting;

        4.      That the Court order such other and further relief as it deems just and proper.


Dated:  September 7, 2017        JORDAN LAW GROUP


By: _____
        PATRICK JORDAN

PETITION TO VACATE ARBITRATION AWARD

EXHIBIT A

# COLLECTIVE BARGAINING AGREEMENT

## -between-

## United EMS Workers

## Local 4911 AFSCME, AFL-CIO

 

## and

## Medic Ambulance Service, Inc.

## April 26, 2014 through and including April 25, 2021

i

# Table of Contents

| Article | | Page No. |
|---|---|---|
| | Agreement | 1 |
| | Preamble | 1 |
| Article 1 | Recognition | 1 |
| | 1.1 Scope of Agreement | 1 |
| | 1.2 Employee Defined | 1 |
| | 1.3 Extra Contract Agreements | 1 |
| | 1.4 Bargaining Unit Work | 2 |
| Article 2 | Union Security | 2 |
| | 2.1 Union Membership | 2 |
| | 2.2 New Employee/Termination Notice/Change of Status | 2 |
| | 2.3 Union Dues/Wage Information | 2 |
| | 2.4 Applicable Law | 2 |
| | 2.5 Union Activity | 2 |
| | 2.6 Court/Government Agency-Ordered Garnishment Administrative Fees | 3 |
| Article 3 | Union Rights | 3 |
| | 3.1 Shop Stewards | 3 |
| | 3.2 Access of Union Representatives | 3 |
| | 3.3 Union Bulletin Boards | 3 |
| | 3.4 New Employee Orientation | 3 |
| Article 4 | Management Rights | 4 |
| Article 5 | Grievance and Arbitration | 4 |
| | 5.1 Grievance Procedure | 4 |
| | 5.2 Time Limits | 5 |
| | 5.3 Participants | 5 |
| Article 6 | Corrective Action and Discharge | 6 |
| | 6.1 Reasons for Corrective Action and Discharge | 6 |
| | 6.2 Procedure | 7 |
| | 6.3 Corrective Action Notices | 7 |
| | 6.4 Retention Period | 7 |
| | 6.5 Disclosure | 7 |
| | 6.6 Time Limits | 7 |
| Article 7 | New Employee Probation | 8 |
| Article 8 | Health and Safety | 8 |
| | 8.1 Employer's Duty | 8 |
| | 8.2 Right to Refuse Unsafe Work | 8 |
| | 8.3 Employer Paid Immunizations | 8 |
| | 8.4 Safety Equipment | 9 |
| | 8.5 Work Stations and Crew Quarters | 9 |
| | 8.6 Alcohol, Tobacco and Drug-Free Workplace | 10 |
| | 8.7 Ergonomic and Office Equipment | 10 |

i

|  |  |  |
|---|---|---|
| | 8.8 Health, Safety and Best Practices Committee | 10 |
| | 8.9 Employee Assistance Program | 10 |
| Article 9 | Education and Training | 11 |
| | 9.1 Licensing/Qualifications | 11 |
| | 9.2 Paramedic Continuing Education | 11 |
| | 9.3 Paramedic Re-Certification and Re-Licensure Fees | 11 |
| | 9.4 EMT Re-Certification | 12 |
| | 9.5 Communications Center Training | 12 |
| | 9.6 Trainee Progress | 12 |
| | 9.7 | 12 |
| Article 10 | Hours of Work | 12 |
| | 10.1 Work Schedule | 12 |
| | 10.2 Workweek Defined | 13 |
| | 10.3 Work Hours | 13 |
| | 10.4 Shift Bidding | 14 |
| | 10.5 Paid Breaks | 14 |
| | 10.6 Maximum Consecutive Shifts | 15 |
| | 10.7 Report in Pay | 16 |
| | 10.8 Two Employees/Same Assignment | 16 |
| | 10.9 Shift Trades | 16 |
| | 10.10 Mandatory Assignment of Overtime | 17 |
| | 10.11 Overtime | 17 |
| | 10.12 Holdover | 18 |
| Article 11 | Seniority | 18 |
| | 11.1 Seniority Defined | 18 |
| | 11.2 Loss of Seniority | 18 |
| | 11.3 Seniority Lists | 18 |
| | 11.4 Application of Seniority | 18 |
| | 11.5 Changes to Work Schedules and Unit Assignments | 18 |
| | 11.6 Filling Open Shifts | 18 |
| | 11.7 Filling Vacant Job Position(s) | 18 |
| | 11.8 Layoff and Recall | 19 |
| Article 12 | PTO and Holidays | 20 |
| | 12.1 Eligible Paid Time Off (PTO) | 20 |
| | 12.2 Paid Time Off (PTO) Accrual | 20 |
| | 12.3 PTO Use | 21 |
| | 12.4 Vacation Scheduling | 22 |
| | 12.5 PTO Carry Over | 22 |
| | 12.6 PTO at Termination | 22 |
| | 12.7 PTO Pay in Lieu of Time Off | 22 |
| | 12.8 Holidays Observed | 22 |
| Article 13 | Leaves | 23 |
| | 13.1 Personal Leave | 23 |
| | 13.2 Family, Pregnancy, and Medical Leave | 23 |
| | 13.3 Military Leave | 23 |
| | 13.4 Workers Compensation Leave | 24 |
| | 13.5 Returning from a Leave of Absence | 24 |

| | | |
|---|---|---|
| | 13.6 Jury Service | 24 |
| | 13.7 Subpoena/Witness Service | 24 |
| | 13.8 Domestic Violence Leave | 24 |
| Article 14 | Employee Benefits | 25 |
| | 14.1 Health | 25 |
| | 14.2 401(k) Plan | 25 |
| | 14.3 IRS Section 125 Flexible Spending Plan | 26 |
| | 14.4 Credit for Time Served with a Previous Provider | 26 |
| | 14.5 Health Insurance Reopener | 26 |
| Article 15 | Compensation | 26 |
| | 15.1 Wages | 26 |
| | 15.2 Movement through the Wage Scales (Appendix B) | 27 |
| | 15.3 Appointment – Wages | 27 |
| | 15.4 Movement from EMT to Paramedic Wage Scale | 27 |
| | 15.5 Ratification Cash Payment | 28 |
| | 15.6 Night Differential | 28 |
| Article 16 | Uniforms | 28 |
| | 16.1 Uniform Issue | 28 |
| | 16.2 Replacement of Worn Uniform Items | 29 |
| | 16.3 Uniform Maintenance Allowance | 29 |
| Article 17 | No Strike/No Lockout | 29 |
| Article 18 | No Discrimination/No Harassment | 30 |
| | 18.1 Gender Intent | 30 |
| | 18.2 No Discrimination/No Harassment/No Retaliation | 30 |
| Article 19 | Successor Clause | 30 |
| Article 20 | Drug-Free Workplace | 30 |
| Article 21 | Personnel Files | 31 |
| Article 22 | No Subcontracting | 31 |
| Article 23 | Administrative Leave | 32 |
| Article 24 | Disasters/Incidents | 32 |
| | 24.1 Local Disasters | 32 |
| | 24.2 Strike Teams | 32 |
| | 24.3 Stress Counseling | 33 |
| Article 25 | Scope of Agreement | 33 |
| | 25.1 Severability | 33 |
| | 25.2 Policies, Procedures and Work Rules | 33 |
| | 25.3 Modifications to the Agreement | 33 |
| | 25.4 Complete Agreement | 33 |
| Article 26 | Duration | 34 |
| | 26.1 Term of the Agreement | 34 |
| SIGNATURE PAGE | | 35 |
| APPENDIX A | Seniority Lists (Anniversary, Classification and Shift Bid) | 36 |
| APPENDIX B | Wage Scales | 41 |
| APPENDIX C | Wage Scale Seniority Date List | 49 |

iii

# AGREEMENT

This agreement is entered into on April 26, 2014 by and between the United Emergency Medical Services Workers, Local 4911, AFSCME, AFL-CIO (hereinafter referred to as "Union") and Medic Ambulance Service, Inc. (hereinafter referred to as "Employer").

# PREAMBLE

The Employer and the Union agree that the purpose of this agreement is to ensure the delivery of the highest quality of care and utmost level of professionalism to our patients, their families, our health care associates, and the community in general. With that, the Employer and the Union recognize that to ensure quality of care and professional behavior that covered employees need to feel a certain level of job satisfaction.

The Employer and the Union recognize that the duties performed by employees involve life and death situations. The Employer and the Union recognize their responsibility to assist in resolving all disputes relating to this agreement reasonably. In recognizing this responsibility, the Employer and the Union agree to implement and exercise the provisions of this contract in a fair and responsible manner. Therefore, the two parties enter into the following agreement:

# ARTICLE 1 - RECOGNITION

## 1.1    Scope of Agreement
The Employer recognizes the United Emergency Medical Services Workers, AFSCME, AFL-CIO as the sole and exclusive bargaining representative for the work performed by all full-time and regular part-time Emergency Medical Technicians (EMTs), Paramedics, Dispatchers and SSTs performing work at or from the Employer's facilities in Solano County, excluding all other employees, managers, guards, and supervisors as defined in the National Labor Relations Act (NLRA).

## 1.2    Employee defined
The term "Employee" as used herein shall include all Emergency Medical Technicians (EMTs), Paramedics, Dispatchers and SSTs referenced in Section 1 above.

## 1.3.    Extra-contract Agreements
In recognizing the Union's sole and exclusive bargaining representative status the Employer agrees not to enter into any agreement(s) or contract(s) with its employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void. Any document which contains a Union Representative's signature will not be considered an extra contract agreement.

1

1.4.    Bargaining Unit Work

The Employer shall not unilaterally attempt to erode the bargaining unit by changing the title of a bargaining unit classification as defined in Section 1 above. In the event the Employer desires to change a bargaining unit classification, the Employer shall provide the Union ten (10) days advance notice and provide the Union an opportunity to negotiate the Employer's proposed change.

# ARTICLE 2 - UNION SECURITY

2.1    Union Membership

As a condition of continued employment, all employees included within the bargaining unit described in Article 1 of this Agreement shall either become a member of the Union and pay dues and fees thereto or in lieu thereof shall pay an amount equal to the Union's initiation fee and shall thereafter pay to the Union each month, an amount equal to the regular monthly dues and fees in effect for other employees in the bargaining unit who are members of the Union. This obligation shall begin on the thirty-first (31st) day following the beginning of employment, or the effective date of this Agreement, or the execution date of this Agreement, whichever is later. Employees must notify the Union in writing of their intention not to be a member of the Union and to pay a fair share/agency shop fee in lieu of the Union's regular monthly dues and fees in effect for other employees in the bargaining unit who are members of the Union. The Union will comply with applicable laws regarding its calculation of the fair share/agency shop fee and the information provided to non-Union members relation to that calculation.

2.2    New Employee/Termination Notice/Change of Status

The Employer agrees to furnish the Union each month with the name(s) of all newly hired employees covered by this Agreement, their addresses, classifications, dates of hire.

2.3    Union Dues

A.    Wage Information

The Employer will submit to the Union each pay period the names and wages paid to all employees who worked during the pay period.

The Employer assumes no liability or responsibility for collection of dues and/or initiation fees.

2.4    Applicable Law

The foregoing provisions shall be subject to applicable provisions of federal and state laws.

2.5    Union Activity

The Employer will not discriminate in any way against any employee engaging in official Union activity.

2

2.6    Court/Government Agency-Ordered Garnishments–Administrative Fees

The Employer will deduct a one dollar and fifty cent ($1.50) monthly administrative fee from each employee's paycheck for each individual court/government agency-ordered garnishment requirement or an employee's request. This deduction will continue for each month a garnishment deduction is made until such time as the garnishment is rescinded or paid in full.

# ARTICLE 3 - UNION RIGHTS

## 3.1    Shop Stewards

The Employer recognizes the right of the Union to select a reasonable number of employees as Union shop stewards. The Employer agrees that there will be no discrimination against shop stewards. Shop stewards will not be recognized until the Union has notified the Employer in writing of the names of any employees becoming shop stewards. The Union will notify the Employer in writing when an employee leaves the position of shop steward. Shop stewards shall suffer no loss in pay for attendance at investigatory and grievance meetings held during their shift.

## 3.2    Access of Union Representatives

A duly authorized representative of the Union shall be allowed to visit the premises of the Employer to meet with employees on duty in order to conduct legitimate Union business, as long as the Union representative has notified the Employer of their presence prior to visit. No Union business conducted on the Employer's premises shall interfere or interrupt with the work of any Employee. Union business between a Union representative and an employee shall not be overheard or observed by patients, customers, or the general public.

## 3.3    Union Bulletin Boards

A.    Bulletin boards, purchased by the Union, shall be placed at a mutually agreeable conspicuous location at each work site to post official Union business (on UEMSW letterhead stationery or an official UEMSW publication). The bulletin boards will be maintained by the shop steward and official Union representative. The Manager or his/her designee shall receive copies of all material to be posted prior to posting. The Employer and the Union recognize the Employer's right to remove posted material which is derogatory or damaging to the Employer's business or industry after consultation with the Union representative.

B.    Materials shall be posted only upon the bulletin board space as designated and not upon walls, doors, windows, etc.

## 3.4    New Employee Orientation

The Employer shall provide the Union with five (5) days advance notice of upcoming new employee orientations. The Union shall be entitled to meet with and address employees attending each new orientation program. Union representatives shall pre-schedule the meeting date through the Education Manager and shall be entitled to a minimum of fifteen (15) minutes to address employees.

3

# ARTICLE 4 - MANAGEMENT RIGHTS

All management rights, powers, authority, and functions, shall remain exclusively vested in the Employer. It is expressly recognized that such rights, are by no means limited to, the full exclusive control, management and operation of the business, the scope of its activities, the right to establish work rules, change shifts, work schedules, staffing or number of ambulances, the determination of the number, size, and location of its facilities or any part therefore and the extent to which it and its facilities or any part thereof, shall be operated, consolidated, relocated, shut down, sold, otherwise transferred, the right to terminate, merge, sell, or otherwise transfer the business or any part thereof; the determination of the number of employee's and the assignment of duties thereto and the direction of the working force including, but by the means limited to, hiring, selection, and training new employee's.

It is the intention of the Employer and the Union that the rights, powers, and functions referred to herein shall remain exclusively vested in the Employer, except in so far specifically surrendered by the express provisions of this agreement.

It is also the intent of the Employer and the Union that nothing in this agreement shall impair or infringe on the Employer's right to enforce its current policies and procedures, except to the extent any such policy or procedure conflicts with the express terms of this agreement.

The Employer shall notify the Union at least fifteen (15) days prior to implementation of any decision that impacts matters within the scope of representation for bargaining unit employees. The Employer may take action only after satisfying its obligations under the National Labor Relations Act. If, after written notification to the Union regarding such actions, the Union fails to respond within fifteen (15) calendar days, the Union waives its right to meet and confer on the particular matter.

# ARTICLE 5 - GREIVANCE AND ARBITRATION

## 5.1    Grievance Procedure
A.       The purpose of the grievance procedure is to facilitate a timely means of adjustment by the Employer and the Union following a prompt investigation and thorough discussion of any dispute arising from the interpretation or application of any terms of this agreement and/or disputes concerning working conditions, benefits, or wages.

B.       Employees should attempt to resolve problems with their immediate supervisor prior to resorting to the grievance procedure. Any agreement reached between a supervisor and an employee shall not be considered to be a precedent setting agreement, with a copy provided to the Union at the time of settlement. No agreement between supervisor and employee shall in any way conflict with the terms and provisions of this Agreement.

## Grievance Procedure Outline
### Step One
The Employee or the Union through its steward shall submit the Grievance in writing to the Administrator or VP of Operations (VPO) within ten (10) business days of the occurrence giving rise to the grievance. Within ten (10) business days of receipt of the grievance notice, a Step 1 meeting shall be scheduled. The

4

Administrator or VPO will give his/her answer in writing within ten (10) business days after such meeting. Grievances resolved at this step shall not be precedent setting.

"Occurrence" is the date when the grievant learned of the event that is subject of the grievance or the effective date of discipline or discharge.

"Meeting" shall be defined as either an in person meeting, or if mutually agreeable, via telephone conference.

### Step Two
If the procedure in Step One fails to resolve the grievance then, the grievance shall be submitted to the President or his/her designee within five (5) business days of receipt of the Step One denial. The parties shall schedule a meeting within five (5) business days. The President or his/her designee shall respond, in writing, within five (5) business days from the date of the Step 2 meeting.

### Step Three
In case of failure of the parties to settle the grievance at Step Two the Union shall be entitled to request that the grievance be referred to arbitration or Federal Mediator within five (5) business days from the Unions receipt of the Employer's Step Two response and shall request a list of seven (7) arbitrators from the Federal Mediation and Conciliation Service (FMCS). Within ten (10) calendar days from the receipt of the list from FMCS, the parties shall select an arbitrator by the process of alternately striking names from such list. The party to strike such names shall be on a rotating basis. The arbitrator's decision shall be final and binding on the Employer, the Union, and the employee(s) involved. The cost of the arbitration shall be divided equally; the costs include the arbitrator's fees and expenses, hearing room cost, and the cost of a transcript.

The arbitrator or Federal Mediator shall have no power to add to, or subtract from, or otherwise modify any provision of this Agreement.

## 5.2    Time Limits
By mutual agreement between the Union and the Employer, the time limits of any step of the grievance procedure may be extended and this extension must be confirmed in writing within the specified time limits. In the event either party fails to respond to the grievance within the time limits specified, the grievance shall be resolved on the basis of the opposing party's last stated position without setting precedent.

## 5.3    Participants
The Employer agrees that the grievant shall be allowed to participate in any and all steps of the dispute procedure. The parties agree to exercise their best efforts to arrange grievance meetings which accommodate the schedule of all participants.

## ARTICLE 6 - CORRECTIVE ACTION AND DISCHARGE

### 6.1    Reasons for Corrective Action and Discharge

The Employer reserves the right to issue corrective action to and discharge employees for just cause for any of the actions while on duty; including but not limited to the following below:

1. Breach of fiduciary duty

2. Drunkenness.

3. Gross negligence.

4. Substance abuse.

5. Fighting or horseplay.

6. Selling, transporting or the use of illegal drugs.

7. Insubordination.

8. Refusal or failure to respond to a call as directed by Dispatch or supervisor.

9. Gambling.

10. Any unlawful or illegal act while on duty or conducted on company premises.

11. Possession of a firearm while on duty or on company property.

12. Failure to comply with or deviation from System Status plan, including delayed responses.

13. Theft.

14. Loss of permits or certifications required by the county, state, or company.

15. Sexual or any other kind of harassment.

16. One no call no show.

17. Failure to maintain communication with dispatch.

18. Failure to restock or refuel an ambulance.

19. Failure to complete paperwork by end of shift.

21. Dishonesty, including, but not limited to; timecards, PCR's and any medical record.

22. Placing a unit in service without all required equipment.

6

## 6.2    Procedure

The Employer reserves the right to issue correction action, up to and including discharge, based on just cause and the circumstances of each case. Serious or repeated like offenses may call for corrective action commensurate with the offense or totality of the circumstances and not necessarily based upon the premise of progressive corrective action.

## 6.3    Corrective Action Notices

The Employer shall serve upon an employee in writing or electronically of any corrective action or discharge. The notice shall identify the reasons(s) for the corrective action or discharge and the effective date of the action. The notice shall provide language that the employee's signature is only an acknowledgement of receipt. The Employee or the Union through its steward shall be entitled to contest any such action served upon an employee by the Employer referenced in this Article by filing a written grievance at Step 1 in accordance with the grievance procedure contained in Article 5 of this Agreement.

## 6.4    Retention Period

Records of corrective action shall not be considered for purposes of future corrective action, provided there are no further corrective actions for the same conduct or similar offenses during the applicable retention period:

      Verbal warnings                        12 Months

      Written Warnings/Suspension      24 Months

## 6.5    Disclosure

In the event the Employer serves a notice to or discharges an employee in compliance with this Article, the Employer will, upon request of the employee or the Union, provide to the Union copies of any documents or written statements relied upon by the Employer as a basis for its action. If any of the documentation or written statements contains material deemed to be confidential per HIPPA the confidential information shall be redacted prior to providing such information to the Union. Such information must be produced within ten (10) calendar days from the Union's request. If the employee or Union choose to contest any discharge or discipline it must pursue the matter through the grievance procedure outlined in this Agreement.

## 6.6    Time Limits

To be valid, written corrective action notices and discharges must be issued to the affected employee within twenty-one (21) calendar days after the Employer became aware of the alleged conduct claimed as the basis for the disciplinary action, unless an investigation is ongoing. The time limit for issuing corrective action and discharge notices may be extended with the mutual agreement of the parties on a case-by-case basis when delayed by the involvement of state or local law enforcement or state of local EMS agencies, or the employee or key witnesses are unavailable. The Employer must notify the Union in writing of any ongoing investigation and/or any requested extension of the time limit prior to the expiration of the twenty-one (21) calendar day period and the specific reason(s) for the extension.

7

## ARTICLE 7 - NEW EMPLOYEE PROBATION

A.  Full-time employees covered by this Agreement shall be on probation for their first six (6) months of employment. Part-time employees, shall be on probation for their first twelve (12) month of employment. This probationary period may be extended in compliance with this Agreement by mutual written agreement of the Employer and the Employee, with a copy provided to the Union by the Employer at the time of agreement. At any time during the probationary period an employee may be terminated without recourse through the grievance procedure.

B.  Employees who change job classifications shall be placed on a six (6) month "Promotion Evaluation Period" and will be required to perform the 'new' job to the Employer's expectations. These promoted employees who fail to meet the expectations of the Employer will be returned to their former position and rate of pay (including any applicable contractual pay changes and seniority accrual.

C.  The Employer may voluntarily respond to grievances filed on behalf of probationary employees, either with respect to discipline or termination. By doing so, the Employer does not change the status of a probationary employee, nor does it waive its right to refuse to accept grievances filed on behalf of probationary employees where discipline and/or termination is involved. In the event the Employer utilizes progressive discipline with respect to a probationary employee, this shall not constitute a waiver of the Employer's right to forego such discipline and proceed directly to termination.

## ARTICLE 8 - HEALTH AND SAFETY

### 8.1    Employer's Duty
The Employer shall provide safe, secure, healthful working conditions and shall take actions necessary to minimize the risk of disease or injury to employees. The Employer agrees to comply with applicable federal, state and local health and safety laws and regulations.

### 8.2    Right to a Refuse Unsafe Work
All employees shall be entitled to a safe working environment. An Employee who discovers a potential hazardous condition(s) or unsafe equipment must notify their immediate on duty supervisor of such hazard immediately after the hazard is discovered. No employee will be disciplined for reporting health or safety issues. However employees found to have violated company safety policy may be subject to disciplinary action up to and including termination.

### 8.3    Employer Paid Immunizations
As required by OSHA regulations and for the protection of the Employees the Employer will provide, annually, at no cost, for all Employees the Hepatitis B vaccinations as well as the annual Tuberculosis PPD test, and those immunizations which are in accordance with the recommendations of United States Public Health Service Advisory Committee or the County Health Officer. These vaccines will be made available to employees by designation of a reasonable time and place by the Employer. If the Employer elects to provide an immunization they will not pay the fees for an Employee who chooses to get it from non-Employer sponsored sources. If an Employee elects not to be vaccinated they will be required to sign a declination form provided by the Employer.

8

## 8.4    Safety Equipment

A.  The Employer shall provide the following safety and protective gear which meets the latest NFPA standards for each employee:

1. Gloves -Extrication type gloves;
2. Hearing and Eye Protection- for both in ambulance and outside of ambulance when requested;
3. Safety equipment personal protective equipment (PPE) garments.
    a.  In the event during the term of this Agreement, field employees covered by this Agreement are required to conduct first responder fire safety/extrication duties, the Union shall be entitled to re-open this Agreement for the sole purpose of negotiating terms and conditions related to first responder duties and the necessary PPE items required to perform such duties.

B.  The Employer shall furnish in each ambulance the following safety equipment, which meet the latest applicable standards:

1. Protective eyewear
2. Biohazard kits
3. ANSI 207 reflective safety vests
4. Hazmat placard interpretation books
5. Bullard Safety helmets with eye protection
6. A functional portable communications device shall be made available to each crew.  All portable communications devices/radios shall include an appropriate holster/clip.

C.  Upon presentation of a receipt, the Employer shall reimburse non-probationary, full-time employees for expenditures for the repair or replacement of boots or other approved footwear up to a total maximum of seventy five dollars ($75) on each full-time employee's anniversary date within the first year of this agreement and seventy-five dollars ($75) biennially on the full-time employee's anniversary date each biennium thereafter.  Any footwear applicable to this section is only to be worn on duty for the Employer.

## 8.5    Work Stations and Crew Quarters

A.  Work stations and crew quarters shall be maintained by the Employer in a habitable condition in accordance with the federal, state, local laws, ordinances and Crew Quarters Policy (#202.02.01 (c) dated May 1992).

B.  Crew lounges where 24-hour crews are assigned shall continue to include a minimum: one bed for each on-duty 24 hour crew member, heating and air conditioning system, shower facilities, refrigerator, stove (if permissible), living room furniture to accommodate on-duty staff, one dining table/chairs, and a microwave. The Employer shall replace and/or repair the above Company provided items within thirty (30) days after notification to the designated Employer representative.

C.  Employees shall not remove any furnishings or other Employer items from crew lounges.  Employees shall care, clean, and maintain such items.  The Employer will not be responsible for loss or damage to personal items that are brought into work stations.

D.  Special issues concerning such items as post locations, lighting and safety considerations at post locations, access to sanitary washing and bathroom facilities at post locations, and kitchen appliances in crew quarters will be discussed at the health and safety committee.

## 8.6    Alcohol, Tobacco, and Drug Free Workplace

Smoking or use of tobacco products in accordance with local ordinances will not be permitted in areas which constitute either a fire hazard or disturbance to patients, visitors, or co-workers. Smoking is allowed only in designated areas outside of buildings. Chewing tobacco is not allowed on company premises and no tobacco product is allowed in any company owned vehicles.

## 8.7    Ergonomics and Office Equipment

A.  When purchasing VDT equipment, the Employer will purchase VDT equipment with manufacturer-specified non-reflective screens and brightness and contrast controls.

B.  The Employer shall provide non-direct fluorescent lighting in all dispatch centers.

C.  The Employer shall provide chairs that are adjustable in height and with back support.

## 8.8    Health, Safety, and Best Practices Committee

A.  The Employer has established a committee comprised of representatives of the Employer and representatives of the Union, with rotation of chairmanship. The committee shall consist of three (3) management personnel and three (3) bargaining unit employees designated by each respective party.  The focus of this committee is to review and discuss matters and policies regarding any issue of job place health, and safety, as well as issues brought forth to the committee by an employee or the Employer.  They also discuss and make recommendations of possible implementation of procedures or devices to better serve patients in a more effective way. The Employer has the sole discretion as to implement any changes recommended by this committee. The committee will not have any power to resolve grievances, change provisions of this agreement, or to negotiate new provisions.

B.  The committee meets quarterly unless both parties agree to either cancel a meeting or schedule a second meeting within the quarter. Any Employee may petition the committee to review or conduct an investigation into a issue relating to this committee (a list of some related issues are provided below) during the discussion of an Employee petitioned issue the petitioning Employee will be allowed to address the committee. The Employer may elect to act immediately to correct the situation prior to the committee meeting.

1. Review possible new equipment or protective devices or procedures
2. Review safety related and ergonomic training needs
3. Job related procedures
4. Equipment currently used in the performance of job duties
5. Accidents, only to determine if they could have been prevented
6. Any perceived safety or hazardous situation issue
7. Workers compensation claim, only to determine if it could have been prevented
8. Facility security issues.

## 8.9    Employee Assistance Program

All Employees may participate in the company's Employee Assistance Program immediately upon hire. Administrative costs of the program are fully paid by the Employer. Any communications or records for an Employee utilizing this program shall be strictly confidential.

10

## ARTICLE 9 - EDUCATION AND TRAINING

### 9.1    Licensing/Qualifications

A.  Employees are required by the State or County to possess and maintain any licenses certificates, and/or accreditations in the performance of their job responsibilities.  Employees shall be solely responsible to maintain said licenses, certificates, and county accreditations in a current and valid status, and have originals or clear legible copies of licenses, certificates, and county accreditations on their person at all times while on duty.  The Employer shall reimburse all full time employees the full cost to renew the appropriate license, certificate, and accreditation required by the State or County for the performance of their job responsibilities.  The Employer shall reimburse provided such reimbursement requests are submitted within seven (7) business days from the date which the employee paid such fee(s).  New full-time employees shall be reimbursed for certifications after one year of full-time service.

B.  It is the sole responsibility of each individual employee to ensure that all licenses, certificates, and/or accreditations are maintained and in the employee's possession at all times while on duty.  Failure to maintain a valid license, certificate and accreditation will result in disciplinary action, up to, and including termination.

C.  Detailed Licensing and Certification renewal procedure can be found in Employer Policy 106.11.02. (dated March 29, 2011).

D.  The Employer shall provide continuing education units for all mandatory job related training.

### 9.2    Paramedic Continuing Education

All paramedics shall be entitled to attend CE training equal to twenty-four (24) hours per calendar year while off duty.  Employer provided CE training will be made available to all employees and shall be given priority over outside providers where the subject of such training is the same.  Should the state or county require additional hours of continuing training education, the employer will provide such training

### 9.3    Paramedic Re-certification and Re-License Fees

A.  The items listed in section B. below may be required to maintain paramedic accreditation.  The Employer will provide each required item at no charge or reimburse employees the fee paid, upon verification of a passing score or certificate of completion and presentation of receipt of payment.

B.  If the Employer provides any of, or subsequently sponsors the following training within the six (6) months preceding the expiration date of a license or certification and an employee elects not to participate, then he/she will remain responsible for payment of all required fees for the following:

1.    Basic Cardiac Life Support (CPR)

2.    Advanced Cardiac Life Support (ACLS)

3.    Pediatric Advanced Life Support (PALS) or Pediatric Education for Pre-hospital Professionals (PEPP)

4.    International Trauma Life Support (ITLS) or Pre-hospital Trauma Life Support (PHTLS)

11

5.    Any other license/certification required by the County or State.

## 9.4    EMT Re-certification

A.  All EMT's shall be entitled to attend employer provided CE training for up to twelve (12) hours per calendar year.  Should the state or county require additional hours of continuing training education, the employer will provide such training

B.  If the Employer provides any of, or subsequently sponsors the required training within the six (6) months preceding the expiration date of a license or certification in the training and an employee elects not to participate, then he/she will remain responsible for the payment of all required fees.

## 9.5    Communications Center Training

Dispatchers shall be trained at the level appropriate for the level of dispatch services they provide.  In the event the Employer provides priority dispatch or pre-arrival instructions, all dispatchers performing such services shall be trained, certified or accredited in an Emergency Medical Dispatch program.  The Employer shall make all training available to all dispatchers and pay dispatchers to attend such training and reimburse dispatchers for any license; certification or accreditations associated with the Emergency Medical Dispatch program.  The Employer shall provide CPR training to all communications center personnel.

## 9.6    Trainee Progress

Employees who serve as FTOs shall report the progress of trainees to the Quality Assurance Manager at the conclusion of trainee's third shift in order to evaluate the trainee's performance and whether the trainee's FTO period will be extended.  Employees who serve as FTOs shall be paid an additional one dollar and twenty-five ($1.25) for Paramedics and one dollar ($1.00) for EMTs per hour for all hours worked.  In order to remain in paid FTO status, employees must be and remain in full compliance with all terms and conditions in FTO Policy 201.08.01.

9.7    Under no circumstances shall employees be required to pay for any Employer provided or sponsored class(es) and no full-time employees shall be required to pay for certification card(s).

# ARTICLE 10 - HOURS OF WORK

## 10.1    Work Schedule

A.  The following sections are for the purpose of defining normal work hours and are not a guarantee of hours.

B.  Work schedules available for full time Employee's:

10-hour shifts
12-hour shifts
24-hour shifts

Special Events (BLS and ALS)

12

C.    Work Scheduling Options

All work scheduling options afforded under this article, such as but not limited to, compensated time off, overtime, shift trades, etc. shall be administered by the Employer's electronic scheduler system. All scheduling options shall be available to each employee verbally at the time of the bid. At the conclusion of any bidding afforded under this Article, the Employer shall distribute a complete copy of each individuals shift to each employee. A union representative or union steward will be allowed to attend and observe all shift bids.

D.    The Employer reserves the right (with at least fourteen (14) days notice given to the Union) to add, delete, or change any work schedule to better meet the needs of their clients and contractual obligations and/or to meet system status requirements. The Union, upon written request, within fourteen (14) days after the Union's receipt of Employer's notice shall be entitled to a meeting with the Employer to discuss schedule change and possible impacts on Employees.

10.2    Workweek Defined

The workweek shall be defined as beginning on Saturday and ending on the following Friday. Payroll is issued bi-weekly on Thursday for the pay period that ends on the previous Friday. All employees are encouraged to participate in the Direct Deposit pay program. This electronic deposit of funds produces a check stub instead of an actual check at each pay period.

10.3    Work Hours

A.    Full-time employee defined

Full-time employees are defined as employees who are guaranteed to have a regular schedule averaging a minimum of forty (40) hours per week.

The term "work(s) as used as a verb in this Agreement is defined as any time actually worked, time in a paid status, any authorized leave and any time spent in a disciplinary suspension. Such employees who at any point during a three consecutive rolling-month period reacquire an average of forty (40) hours shall be returned to Full-time status and the Employer shall immediately restore all applicable Full-time benefits. Full time employees will retain seniority on a separate list. Full-Time employees who become Part Time employees will retain seniority for bidding purposes.

B.    Regular Part-time employee defined

1.    A regular part-time employee shall be defined as an employee who regardless of average hours worked per week does not work a regular schedule. To maintain regular part time status an employee must work a minimum of three (3) shifts per month. If there are no shifts available the employee must put in six (6) available days within that month. Exceptions to this minimum part time requirement may be made by mutual agreement.

2.    Regular Part-time employees must submit availability, or work, at least one (1) weekend shift per month as part of the three (3) shift minimum. A "weekend shift" for purposes of this requirement is defined as a Saturday or Sunday shift. Exceptions may be made by mutual agreement.

3.    The above requirements do not include standby and special events shifts, and do not constitute a guarantee of hours.

13

4.   Full time employees desiring to become Part time must request status change in writing and submit to employer at least fourteen (14) days prior to desired part time start date. Status requests are granted at the sole discretion of the employer. No status changes from Fulltime to Part time will be allowed during the first year of employment.

C.   Reporting for Shifts

Employees are required to report and arrive at their assigned station, for their scheduled shift on time. Once an employee has reported for their scheduled shift they will remain on duty until properly relieved and cleared by dispatch with Supervisor approval.

If an Employee is unable to report to work on a scheduled shift the employer will require a minimum of four (4) hour notice prior to the start of said scheduled shift. If an Employee fails to give notice prior to four (4) hours of the start of their shift without an acceptable reason will be subject to the following progressive discipline: 1st offense = Written warning, 2nd offense = Two (2) day suspension, 3rd offense = Termination.

## 10.4   Shift Bidding
A.   There will be a bid for full time shifts every six (6) months, such shift bids shall become effective each January and July. Bids will be based upon employee shift bid seniority, in compliance with Article 11 Seniority. Once bid an employee cannot voluntarily change the shift bid assignments.

Management reserves the right to refuse any pairing of shift partners for shift bids given good and sufficient cause to do so, (i.e., documented quality assurance issues; irreconcilable personality differences).

B.   Shift Bid information shall be provided to the Employee fourteen (14) calendar days in advance of bid day.

C.   Employees shall be entitled to bid on shift assignments in shift bid seniority order. Bids shall be awarded to the senior qualified employee within each classification.

D.   Once a shift bid has been successfully completed by an employee in compliance with this section, an employee can not voluntarily change the semi-annually shift assignments.

## 10.5   Paid Breaks
A.   Rest Periods

The Employer shall authorize and permit all employees working shifts of less than 24 hours will be allowed to take paid rest periods at a rate of ten (10) minutes for each four (4) hour period worked or major fraction thereof. A "major fraction" is considered anything more than two (2) hours. Due to the nature of the business, employees on a rest period may be interrupted for all calls or requests for service. If the Employer fails to provide an employee a rest period in accordance with these provisions, the Employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that a rest period is not provided. Time at "post" will be considered as rest periods.

14

For employees working 24 hour shifts, "Down time" (Down time shall be interpreted as time on duty at a 24 hour station while not on an active call) will be considered as paid rest periods.

B.  Meal Periods
   1.  Employee's working a twenty-four (24) hour shift will be allowed three (3) paid meal periods consisting of thirty (30) minutes duration each.

   2.  Employee's working shifts of less than twenty-four (24) hours in duration will be allowed one (1) thirty (30) minute paid meal period per each five (5) hour period or any portion thereof over three (3) hours. Meal periods shall be scheduled by the Employer on a first request basis subject to system status at the time of request. All meal periods are subject to interruption at any time due to System status Management requirements to ensure patient care is not jeopardized.

   3.  In the event an employee covered under this Agreement works two consecutive shifts the Employer shall authorize and permit such employee to receive an additional paid meal break immediately at the conclusion of the first shift.

C.  Bathroom Breaks
   1.  Bathroom breaks shall not be unreasonably withheld; or be a cause for discipline.

   2.  The Employer shall provide reasonable access to bathroom facilities in close proximity to the Employee's assigned location of work throughout all hours of the shift.

D.  Sleep periods on duty
Employee's working on a twenty-four (24) hour shift will be allowed an eight (8) hour paid sleep period. Paid sleep periods may be interrupted for the purpose of any call whether emergent or routine transfer, posting for coverage per System Status Plan, and standby's. An Employee working a twenty-four (24) hour schedule will be allowed to sleep after 17:00 pm as long as all station chores are completed, and all company and/or county response time requirements are met. Employees working on a twenty-four (24) hour shift are required to remain in full uniform (with the exception of footwear while in the station) during normal business hours (0800-1700).

Employees working a consecutive shift shall be entitled to sleep as needed with prior Supervisor approval. Such supervisor approval shall not be unreasonably withheld.

## 10.6   Maximum Consecutive Shifts
No employee shall be required to work more than two (2) consecutive shifts (except in cases of County declared disaster or emergency without a minimum break of twelve (12) hours without mutual agreement between the Employee and Employer.

15

## 10.7    Report In Pay

A. If an employee shows up for a regular scheduled shift (not an additional or overtime shift) and is unable to be utilized the Employee will have the following options:

1. Perform four (4) hours alternate work at regular pay rate, and if Employee desires they may choose to use accrued compensated time off to recover remaining hours of shift;

2. Use accrued compensated time off to cover entire hours of shift;

3. Or be released from duty with four (4) hours pay, with supervisory approval.

B.    The Employer agrees to provide six (6) hours' advance notice of the cancellation of any prescheduled overtime.

## 10.8    Two Employees/Same Assignment

In the event that two (2) employees report for the same assignment, in the absence of mutual agreement, the employee regularly scheduled for that assignment shall work. In the event neither employee is regularly scheduled for that assignment, the most senior employee will choose whether or not to work. Should the most senior employee decide not to work, the employee with less seniority must work.

## 10.9    Shift Trades
## A.    Shift Trades

All Full-time employees shall be entitled to trade shifts with other Full time Employees. The Employer reserves the right to approve or deny shift trades in accordance with the following procedures:

1.    All Shift trades shall be submitted via the Zoll Crew Scheduler, or its future equivalent, five (5) calendar days prior to the date of the requested trade date.

2.    The Employer will respond in writing with an approval or denial to the Employee's trade request via the Zoll Crew Scheduler, or its equivalent within forty-eight (48) hours after the Employer receives the shift trade request. Trades will be approved at the discretion of the Employer, such request shall not be unreasonably withheld.

3.    Shift trades shall not result in additional labor costs to the Employer.

4.    Shift trades shall not result in uncovered hours.

5.    Shift trades will not be allowed for the purpose of avoiding discipline.

6.    Employees will be held accountable for shifts they agree to cover.

7.    Failure of an employee to show for agreed shift trade will be considered a no call/no show.

16

8. There is no limit on the number of shift trades allowed to an Employee, shift trades must be completed within the same pay week (from Saturday to the following Friday).

## 10.10 Mandatory Assignment of Overtime
A. Mandatory shifts

1. When the Employer is unable to fill an available shift through any other means other than a mandatory assignment to an Employee, Mandatory Assignments will be made in reverse seniority order. Employees will be given a minimum of seventy two (72) hours notice prior to mandatory shift. The Employer shall continue to strive to fill the mandated shift up to twelve (12) hours prior to the start of the shift requiring mandation. In the event the Employer is successful in filling the shift the Employer shall immediately communicate with the mandated employee and not require the employee to work the mandated shift.

2. When a Mandatory shift has been assigned, the Employee will be moved to the bottom of the list. If an Employee refuses to accept a mandatory shift assignment they will be subject to the following progressive discipline 1st offense = Written Warning 1st 2nd offense = One (1) day suspension, 3rd offense = Termination.

3. A continuing database of employees assigned mandatory shifts will be maintained by the Employer and available for review at all times, to ensure reverse seniority is maintained by assignment with the following guidelines:

    i. No employee will be mandatoried more than one shift per two consecutive pay period block of time.
        1. 12-hour employees shall have a 12 hour break before and after the mandated shift;
        2. 24-hour employees mandated to a 12-hour unit shall have a 6-hour break prior to the 12 hour shift.
    ii. An employee cannot be assigned a mandatory shift that will interfere with his their regular scheduled shift.

If an Employee must refuse a mandatory shift assignment due to an extenuating circumstance the Employee must provide documentation of said circumstance to the Employer and at the sole discretion of the Employer may pardon employee from discipline. A refusal will not exclude the employee from mandatory shift assignment rotation.

## 10.11 Overtime
A. Overtime Defined

1. All Employees, will be paid one and one-half (1 ½) times their regular hourly rates for all hours worked in excess of forty (40) in a single workweek.

2. SST employees working twelve (12)-hour shifts will be paid their regular hourly rates for ten (10) hours and one and one-half (1 ½) times their regular hourly rates for two (2) hours. After twelve (12) hours, employees will be paid double (2X) their regularly hourly rates.

17

3.    Employees who regularly work a 12 hour shift and are reassigned to a twenty-four (24)-hour shift will be paid at the twelve (12) hour rate.

## 10.12 Holdover

Should the potential for a mandatory holdover arise, every possible effort will be made by the on-duty supervisor or his/her designee to find voluntary coverage before a mandatory holdover is implemented. Except in circumstances beyond the control of the Employer, no employee will be held over longer than 4 hours without the employee's agreement. Should an employee be held over more than 4 hours for a 10 or 12 shift or more than 8 hours for a 24-hour shift, such an employee shall be paid one and one half times (1 1/2X) their regular hourly rate, as a premium, for all hours held over beyond 4 hours for a 10 or 12 hour shift or 8 hours for a 24 hour shift.

## ARTICLE 11 - SENIORITY

### 11.1    Seniority Defined
### A.    Classification Seniority

Classification seniority for full-time employees shall be defined as the period of continuous service from the employee's most recent date of hire into such full-time employee's current classification. (See Appendix A)

Classification seniority accrual for Full time employees will begin from the date of first shift assignment following completion of training (i.e., first shift without an FTO) through continuous full time employment with the Employer.

### B.    Anniversary Date
Anniversary date for employees covered by this Agreement shall be defined as the period of continuous service from the employee's most recent date of hire with the Employer. (See Appendix A)

C.    Seniority for employees who change job classifications shall remain unchanged for purposes of time-off accruals and benefits. Employees who change job classifications will be granted up to one year seniority for bidding purposes in the new classification.

D.    A current employee's time-off accruals and benefits shall not be diminished, except as provided for by Full Time Contribution Policy (FTC)(#106.02.01 (B)) dated July 10, 2012.

### E.    Shift Bid Seniority Defined
Shift bid seniority accrual for Full-time employees will begin from the date of first shift assignment following completion of training (i.e., first shift without an FTO) through continuous full time employment with the Employer.

Employee's working part time shall accrue shift bid seniority at 50% of full rate. Part-time employees who become full-time employees will be given their part-time seniority towards their full-time shift bid seniority.

### 11.2    Loss of Seniority
Employees will lose seniority rights upon resignation and/or discharge.

18

## 11.3    Seniority Lists

The Employer shall maintain a list of all Employees covered by this agreement containing the Employee's name, and hire date(s), both classification seniority and by anniversary date, if different than classification seniority date. The Employer shall provide a copy of the seniority list to the Union upon request. All decisions that are subject to seniority application will be made based on the most recent seniority list.

## 11.4    Application of Seniority

An employee's seniority equal to their classification seniority shall be applied to personnel decisions, such as, but not limited to time-off accruals and benefits, etc. Shift bid seniority will be used for the purposes of shift bidding, filling of available shifts, assigning of mandatory shifts, and the scheduling of compensated time off.

## 11.5    Changes to Work Schedules and Unit Assignments

Unless circumstances beyond the Employer's control dictate otherwise, work schedules and changes to the employee's regular unit assignment shall be posted and/or provided to employees at least fourteen (14) calendar days in advance.

## 11.6    Filling Open Shifts

A.      Available hours/shifts shall be defined as those hours/shifts, which are open.
        Available hours filled as follows:

        1.      Part-time employees;
        2.      Full time employees on the available list by seniority;
        3.      Any employee willing to accept the shift;
        4.      Any means available to the Employer (i.e., non-bargaining unit management personnel);
        5.      Mandatory call back in reversed order of seniority.

B.      Availability schedules shall be submitted in accordance with the established practice.

## 11.7    Filling Vacant Job Position(s)

In the event the Employer wishes to fill vacant positions they shall be filled subject to the following provisions:

Positions declared vacant by the Employer shall be posted for four (4) business days. The resulting vacancy, if any, shall also be posted for four (4) business days. The most senior qualified employee applying for the posted vacant position shall be assigned to the vacancy.

## 11.8    Layoff and Recall

A.  If there is to be a layoff or a reduction in workforce the Employer shall notify the Union no less than fifteen (15) business days prior to the date of layoff and the affected Employee's no less than ten (10) business days prior to the date of layoff. Layoffs shall be by inverse order of seniority by classification, beginning with probationary employees.

B.      As positions become available, qualified employees shall have the right to be recalled within nine (9) months from the date of layoff beginning with the most senior employee in the classification. Employees recalled to employment shall be sent a certified letter announcing such recall. Recalled employees who fail to respond within five (5) calendar days and report for duty no later than fourteen (14)

19

calendar days after notice of recall by certified mail has been received by the employee or refuse a recall to their former classification shall be considered to have waived their recall rights.

C.     Employees who have been notified in writing by the Employer that they will be laid off may apply for an existing vacant position with the Employer provided that they meet all required qualifications.  Such employees will receive preference in the hiring process over non-employees provided they have notified the employer in writing within seven (7) calendar days of receipt of layoff notification.  Employees who accept such a position shall be paid the current rate of pay of the job position and shall retain their same percentage level and cost of benefits.  Employees shall retain their position on the recall list until such recall rights have expired for such classification has been recalled.

D.     No new employee(s) shall be hired into a full time classification until such time as all qualified laid off employees whose recall rights have not expired for such classification have been recalled.

## ARTICLE 12 - PAID TIME OFF (PTO) AND HOLIDAYS

### 12.1    Eligible Paid Time Off (PTO)
A.     Full time employees shall continue to accrue, use, carry-over and cash-out paid time off ("PTO") as specified in this Agreement.

Upon termination of employment, employees will receive pay for all accrued and unused PTO.

B.     All employees covered by this Agreement who have completed their probationary period shall be eligible for Paid Time Off (PTO) which shall accrue from the date of hire without loss of pay in accordance with the schedule provided in Section 12.2.  PTO may be used for personal time, vacation, or sick time as the employee wishes.

### 12.2    Paid Time Off (PTO) Accrual
A.     Employees shall have Paid Time Off (PTO) benefits (i.e. vacation, sick and personal time) computed in accordance with the following schedule:

Paid Time Off (PTO) For Employees Covered by this Section

　　　　1.     For full-time employees working on a twenty-four (24) hour shift PTO will be earned for all regularly scheduled shifts (including regularly scheduled shifts in which employees use PTO) as follows:

　　　　After completion of first shift without a trainer, employees will begin to earn 1.0 hours for every twenty-four (24) hours in a paid status.

　　　　After two (2) anniversary years employees will earn 1.5 hours every twenty-four (24) hours in a paid status.

20

After five (5) anniversary years employees will earn 2.5 hours for every twenty-four (24) hours in a paid status.

After ten (10) anniversary years employees will earn 3.0 hours for every twenty-four (24) hours in a paid status.

After fifteen (15) anniversary years employees will earn 4.5 hours for every twenty-four (24) hours in a paid status.

2.    For full-time employees working a ten (10) or twelve (12) hour shift PTO will be earned for all regularly scheduled shifts, (including regularly scheduled shifts in which employees use PTO) as follows:

After completion of first shift without a trainer, employees will begin to earn 0.5 hours for every ten (10) or twelve (12) hours in a paid status.

After two (2) anniversary years employees will earn 0.75 hours for every ten (10) or twelve (12) hours in a paid status.

After five (5) anniversary years employees will earn 1.25 hours for every ten (10) or twelve (12) hours in a paid status.

After ten (10) anniversary years employees will earn 1.5 hours for every ten (10) or twelve (12) hours in a paid status.

After fifteen (15) anniversary years employees will earn 2.5 hours for every ten (10) or twelve (12) hours in a paid status.

Upon an employee's classification change, any accrued but unused PTO will be converted to allow the equivalent dollar value.

## 12.3   PTO Use
A.    Employees must forward PTO submissions in writing to the Zoll scheduler. Employee submissions for PTO use must be submitted at least five (5) days in advance of the intended usage date. Employee submissions for PTO use shall be approved to the extent local staffing requirements permit on a first come, first served basis. Multiple submissions for the same day(s) off shall be approved in seniority order. Employee submissions for PTO usage that are related to emergencies shall not be unreasonably denied by the Employer. Once an employee's submission has been approved in compliance with this Article, it cannot be canceled.

B.    A minimum of three (3) paramedics and three (3) EMTs may be approved for prescheduled PTO and or vacation on any given day. Additional employees may be approved for prescheduled PTO or and vacation on the same day, at the Employer's discretion, provided adequate personnel are available to accommodate the necessary workload.

21

## 12.4   Vacation Scheduling

Vacation dates may be reserved for the following calendar year (January through December 31) on a seniority basis by written submission to the Zoll scheduler before November 30 of each year. The scheduler shall acknowledge receipt of an employee's submission by providing the employee with an electronic copy of the employee's submission within twenty-four (24) hours. Submissions received after November 30 shall be approved on a first come first served basis.

## 12.5   PTO Carry Over

Full time employees shall be entitled to carry over no more than two hundred and forty (240) hours of PTO over past the employee's anniversary date and accrual. The employee shall be entitled to sell back any amount not allowed to be carried over.

## 12.6   PTO Pay at Termination

An employee whose employment has been terminated or who resigns and who has unused accrued PTO pay shall receive such pay in addition to any other pay due in his/her final check. All sell backs or pay outs at time of termination, either voluntarily or involuntarily, shall be paid as time worked.

## 12.7   PTO Pay in Lieu of Time Off

Employees may, at their option, choose to receive pay in lieu of their PTO accrued amount. Requests for such payment need to be received five (5) days in advance and payable on the next regular payroll date.

## 12.8   Holidays Observed

The Employer shall pay employees covered under this Agreement for the following holidays:

New Year's Day

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas Day

New Year's Eve Day

"Flex" Day (Employee discretion subject to prior approval –eligibility as follows)

- Non-Probationary employees only;
- Allowable once per Anniversary year
- 14 day notice

22

# ARTICLE 13 - LEAVES

## 13.1    Personal Leave

After one (1) year of continuous full time employment all employees are eligible to request a voluntary leave of absence. Unless agreed to in writing by the Employer otherwise, a personal leave of absence shall be a maximum of thirty (30) days. If an Employee who is out on a leave of absence fails to report for work on the first scheduled shift following a leave of absence shall be considered to have resigned his/her position with the Employer. All requests for a personal leave of absence must be submitted in writing and contain the reason for leave. A leave of absence may be extended at the discretion of the Employer. Such leave of absence shall be considered an excused absence from work without pay and the Employer agrees to make every possible effort to return the employee to a comparable position upon return from leave of absence. Seniority will not accrue during a personal leave. Costs for health benefits will be borne by the employee while on a personal leave.

## 13.2    Family, Pregnancy, and Medical Leaves

A.  Under the provisions of the Federal Family and Medical Leave Act of 1993 or the California Family Rights Act as amended in 1993 all employees are entitled to request a leave of absence under these Acts given the requests meet all criteria set forth in these Acts. Employees shall make all reasonable attempts to submit request for leaves at least thirty (30) days prior to first day of desired leave. The Employer shall have the right to request the Employee obtain medical opinions or certifications supporting the leave request. As stated under the provisions of the above stated acts an employee returning to active duty after said leave shall be returned to the former or equivalent position within the company. All Employees must utilize available paid leave in substitution for any part of the twelve (12) week period required by the act. Any extension shall be at the sole discretion of the employer. All medical benefits for an Employee utilizing the Family and Medical Leave Act will continue to be provided by the Employer on the same basis as when the employee is on active duty, the Employee shall still be responsible for the payment of their portion of the Medical benefits to maintain coverage.

B.      If the Employee has requested and been granted leave based on personal injury or illness the Employer reserves the right to require the Employee to submit to a physical examination and/or provide an Employers unrestricted Return to Work Medical Certification Form (2/09) completed and signed by a physician before allowing the Employee to return to active duty.

C.      An Employee who fails to return to work on their first shift scheduled after a leave will be considered to have resigned his/her position with the Employer however prior to an employee being considered resigned the Employer may consider mitigating circumstances surrounding the Employee's failure to return on their first scheduled shift.

D.      The Employer may offer light duty when available to any employee who has a light duty note from their Doctor due to being pregnant or having complications due to a pregnancy.

## 13.3    Military Leave

A.  Military leave will be granted in accordance with the Uniform Services Employment and Reemployment Rights Act of 1994 (USERRA), as amended, and applicable provisions of federal, state and local law.

23

B. Employees who enter active military service, or who are called to emergency military duty, will be granted a leave of absence upon presentation of the appropriate written orders without any loss of seniority. Reinstatement rights are governed by federal, state, and local laws and require that specific requirements be met. The Employer reserves the right to request verification details from any employee returning from a military leave of absence.

### 13.4    Workers Compensation Leave

Any employee who suffers an illness or injury as a result of the performance of their job responsibilities while on duty shall be granted a leave of absence. Employees requesting leave will be required to provide proof of illness or injury by a physician to be released from work responsibilities. If possible the employer shall offer a light duty position to employees injured while working. If such a light duty position is made available, light duty position shall be paid at the applicable job position pay rate.

### 13.5    Returning from a Leave of Absence

Employees who are returning from any of the above stated leave of absences other than those for which federal state mandates the terms and conditions of such a return to work the Employer should make every reasonable effort to place the employee back into an available position for which the employee is qualified. Employees who are returning from a leave of absence of less than 90 days duration, from leave other than those referenced above, shall receive the rate of pay (plus any applicable contract-date wage increases) and shall be entitled to any seniority and benefits the employees had acquired prior to taking such a leave. Employees shall provide the employer with seven (7) days notice of his or her intent to return to act of duty.

### 13.6    Jury Service

An Employee called to serve on jury duty will receive up to three (3) paid days not to exceed a total of eight (8) hours pay as time worked for all regular scheduled shift(s) they will miss due to jury service, except what is required by law minus what the court has paid the employee. Employees retained by the court over four (4) hours shall not be required to return to work for the remainder of the scheduled shift. An employee shall be entitled to take accrued vacation time to recover lost hours due to jury service. An employee called to serve on jury duty shall notify the Administrator within five (5) business days of the notification of service. If this is not given the employee will forfeit jury service pay and not be eligible to use accrued vacation time to recover lost hours. Employees will notify their immediate supervisor daily to report their jury status and any anticipated return to work date.

### 13.7    Subpoena/Witness Service

All full-time employee who is subpoenaed by a court of law for work related matters will receive up to a three (3) days pay (not to exceed eight (8) hours) as time worked for any regularly scheduled shift(s) they are required to miss.

### 13.8    Domestic Violence Leave

Full-time Employees shall be granted upon request paid leave to seek medical attention for injuries caused by domestic violence or sexual assault, to obtain psychological counseling related to an experience of domestic violence or sexual assault. Employees shall also be granted upon request paid leave if they are involved in a judicial action, such as obtaining restraining orders, or appearing in court to obtain relief to ensure the employee's health, safety, or welfare, or that of the employee's child.

All leaves granted subject to this section 13.8 shall be a maximum allowed by California Code 230, et.seq. Full-time employees shall be entitled to use accrued paid leave for leave pursuant of this section.

24

## ARTICLE 14 - EMPLOYEE BENEFITS

### 14.1    Health

The Employer will maintain the current Western Health Advantage 15MHP and Kaiser $30 Co-pay existing coverage of private health and welfare; prescription drug (Western Health Advantage Prescription H), dental and vision plans (Vision Service Plan (VSP) (or their substantially equivalents) to the employee and their dependents.

For employees hired prior to the effective date of this agreement, the following shall apply:

A.    4-36 months - Employee will be offered a choice of HMOs with the Employer contributing 70% employee paying 30%. Employees with dependents, Employer contributing 60% employee 40%.

B.    37- 60 months - Employer contributes 75% employees contributes 25%. Employees with dependents, Employer contributes 60% employee 40%.

C.    61 + months – Employer contributes 80% employee contributes 20%, for employees with dependents, Employer contributes 60% employee 40%.

D.    120 months or more - Employer contributes 90%, for employee contributes 10%. Employees with dependents, Employer contributes 80%, employees contribute 20%.

For employees hired after the effective date of this Agreement, the following shall apply:

E.    4-60 months – Employer contributes 50%, employee contributes 50%. Employees with dependents, Employer contributes 50%, employee contributes 50%.

F.    61+ months – Employer contributes 70%, employee contributes 30%. Employees with dependents, Employer contributes 60%, employee contributes 40%.

G.    The pre-eligibility period for medical, dental and vision benefits is ninety (90) days.

H.    Vision and Dental plans will continue to be covered in full (100%) for the employee only by the Employer and the pre-eligibility period.

I.    Employees who opt not to participate in any of the Company health care and benefit plans will be eligible to receive in lieu pay in an amount equal to 50% of the premium cost for individual major medical coverage based on the Kaiser plan after three (3) months of full-time service.

### 14.2    401(k) Plan

The Employer will continue providing a 401(k) Plan for employees. The Employer will make an annual profit sharing contribution to the 401(k) account for each participating employee who achieves 12 months of continuous employment with the Company and each year thereafter. The annual profit sharing contribution will be based upon the participating employee's contribution up to 4% of an employee's gross wages for the preceding 12 months. The annual profit sharing contribution shall be made to a participating employee's 401(k) account on or before December 31 of each year. Employees are eligible to participate in the

25

Employer's 401(k) plan after one year of service and 1000 hours with the Company and to make voluntary contributions to their individual accounts.

Example

Employee contributes 1% - Employer contributes 1%
Employee contributes 2% - Employer contributes 2%
Employee contributes 3% - Employer contributes 3%
Employee contributes 4% - Employer contributes 3.5%
Employee contributes 5+% - Employer contributes 4%

### 14.3    IRS Section 125 Flexible Spending Plan
The Employer shall continue its existing IRS Section 125 Flexible Spending Plan for bargaining unit employees.

### 14.4    Credit for Time Served with a Previous Provider
Employees of companies purchased or merged with the Employer shall receive credit for time served with the purchased or merged company towards any qualification period for health benefits under this Article.

### 14.5    Health Insurance Reopener
The parties agree that during a window period of August – December 2014 they will enter into negotiations regarding a potential change in health insurance plans which may include a higher deductible. The parties agree to mutually share information regarding costs and impact on both parties.

In the event new language is negotiated regarding health care insurance coverage, such new language and terms will be integrated into the Agreement and all other terms and conditions will remain in effect.

In the event the parties cannot come to mutual terms of agreement over health insurance language, the currently negotiated language will continue in effect, however, the term of the Agreement will be modified to expire upon its 3-year anniversary date which will be defined as three (3) years from the date of initial ratification of the Agreement.

# ARTICLE 15 - COMPENSATION

### 15.1    Wage Increases
The wage scales for employees covered by this Agreement appear in Appendix "B" to this Agreement and reflect the following increases and adjustments:

### A.    Effective upon Ratification of this Agreement: Initial Placement on Wage Scale
All employees covered under this Agreement shall be placed on their respective classification wage scale based upon the employee's wage scale seniority date with the Company. Wage scale seniority date is defined as the time accrued in an employee's current job classification post training. (See Appendix C)

   1.    For example, if Employee A enjoyed their 3rd anniversary of their wage scale seniority date with the Company was on June 30, 2013 Employee A will be placed on the appropriate wage scale at Step 3 and receive such wage increase effective upon ratification of this

Agreement. Thereafter, employee A will progress through the appropriate wage scale on each subsequent Company successive anniversary of their wage scale seniority date.

    2.    Upon ratification and each September 1 thereafter, each employee within the wage scale shall receive a one and one quarter percent (1.25%) COLA increase to base pay.

    3.    Upon ratification each employee above the Top Step of the wage scale shall receive a three and one-half percent (3.5%) COLA increase to base pay.

B.    Effective 9/1/2014 and each September 1 thereafter:

    1.    Each employee with the wage scale shall receive a one and one quarter percent (1.25%) increase to base pay.

    2.    Each employee above the Top Step of the wage scale shall receive a three and one-half percent (3.5%) COLA increase to base pay.

C.    Under no circumstances shall an employee suffer a reduction in compensation as a result of the adoption of this Agreement.

### 15.2  Movement through the Wage Scales (Appendix B)

Each year of this Agreement, employees shall continue progressing through the steps on their respective wage scale at each employee's anniversary of their wage scale seniority date. In the event an employee requests and is granted unpaid personal leave as defined in Section 13.1 of this Agreement, such employee's next step increase may be delayed the equivalent of the duration of the unpaid personal leave. For Example if Employee A requested and was granted an unpaid leave of absence of thirty (30) days, upon return to work after the unpaid personal leave the employee would be required to wait thirty (30) days past their next scheduled step increase to receive such increase.

### 15.3  Appointment - Wages

The Employer may consider an employee's previous work experience in their classification when determining the appropriate starting pay grade for new or returning entrants into the bargaining unit.

### 15.4  Movement from EMT to Paramedic Wage Scale

EMTs who become paramedics shall be placed on the paramedic wage scale as follows:

A.    If the employee's wage as an EMT is lower than the starting rate of pay for Paramedics at the time of advancement, the employee will be placed at the Paramedic starting rate of pay.

B.    If the employee's wage as an EMT is higher than the starting rate of pay for Paramedic, the employee will be placed at the equivalent Paramedic pay step closest to the EMT's wage rate at the time of advancement or the employee's current rate of pay which is greater.

## 15.5   Ratification Cash Payment

Employees shall receive, in a separate check a one-time cash payment upon execution of this Agreement as follows:

| | |
|---|---|
| Part-time employees | $250 |
| Full-time employees 0-4 yrs | $750 |
| Full-time employees 5-9 yrs | $1000 |
| Full-time employees 10+ yrs | $1500 |

## 15.6   Night Differential

Employees working a night shift shall continue receiving five (5) percent above their base hourly rate.

# ARTICLE 16 - UNIFORMS

## 16.1   Uniform Issue

A.    Allotments for uniforms will be in accordance with policy # 106.07.01 (A) dated January 2012. The Employer shall provide uniforms at no cost to employees.  The minimum required uniform allotment for employees will be accordance with the list below:

### Required Uniform Allotment

| Full-time Employee | Part-time Employee |
|---|---|
| Pants (3) | Pants (2) |
| Shirts (3) w/patches | Shirts (2) w/patches |
| Jacket (1) | Jacket (1) |
| Rain Gear (1) | Rain Gear (1) |

1.    The Employer shall provide each new full-time employee, at the successful completion of the FTO evaluation, with a uniform allowance of $350 or a uniform allowance equal to the total cost of the required uniform allotment above in section A, whichever is greater.

2.    The Employer shall provide each new part-time employee, at the successful completion of FTO evaluation at the with a uniform allowance of $250 or a uniform allowance equal to the total cost of the required uniform allotment above in section A, whichever is greater.

3.    The Employer shall provide to each full-time employee annually thereafter a uniform allowance equal to 1/7th of the initial uniform allowance as referenced in Section 1.A.(1) above.

4.    The Employer shall provide to each part-time employee annually thereafter a uniform allowance equal to twelve (12) percent of the initial uniform allowance as referenced in Section 1.A.(2) above.

28

5.    Employees shall be entitled to carryover the above uniform allowances into future years not to exceed $175.

B.    The following items which are required by the Employer but not provided by the uniform vendor shall be provided by the Employer at no cost to the employee:

Belt (1)
Name Tags

C.  Uniforms provided under this Agreement, shall be tough to take the daily stresses of tactical duty, and properly sized in both male and female sizes.

## 16.2    Replacement of Worn Uniform Items
Replacement of worn uniforms will be in accordance with policy #106.07.01 (A) dated January 2012.

## 16.3    Uniform Maintenance Allowance
The Employer agrees to provide a cleaning/laundry allowance of $100 per year on each January 1 of this Agreement to employees to ensure that uniforms consistently present a positive, professional image.  At the sole discretion of the Employer, the Employer may establish, at no cost to employees, a process for the cleaning/laundering of employee's uniforms.  If such a process is established, the cleaning/laundering allowance will be discontinued for as long as such process is sustained.

# ARTICLE 17 - NO STRIKE/NO LOCKOUT

Neither the Union, its agents nor any of its members will collectively, concertedly, or in any manner whatsoever, engage in, incite or participate in any picketing, strike, sit down, stay in, slowdown, boycott, work stoppage, paper strike (the deliberate failure to submit timely, quality, accurate and complete medical reports and billing information), or sympathy strike against the Employer during the term of this Agreement; and the Employer agrees that during the term of this Agreement, it shall not lock out any of its employees covered by this Agreement. It is further understood that the only duly authorized representative of the Union shall use their best effort on behalf of the Union to actively encourage the employee(s) engaging in the violation of this section to cease such conduct.

Employees found to have violated the terms of this Article shall be subject to discipline up to and including discharge. Employees shall have the right to grieve discipline or discharge under this Article to the extent they claim not to have engaged in a violation of this article.

The Employer and the Union recognize that the duties performed by employees involve life and death situations. Failure to immediately transport patients to hospital and/or other designated medical facilities, and respond from hospitals and other medical facilities to patients, can result in compounding the problems of already ill and/or injured patients. Yet, it is also recognized that bargaining unit employees have a need to communicate with other Union employees who are engaged in job actions.

To meet both of these needs, the Employer and the Union agree that:

29

1.    Under no conditions shall employees delay the transport of any patient because of a picket line or any other such job action.

2.    Under no circumstances shall employees delay a response to a request for service due to any Union job action. Employees are expressly prohibited from delaying the response to any request for service or the provisions of any care and/or transport as required.

3.    Employees may, after crossing picket lines to deliver patients, following such patient delivery, return to the picket line and explain to picket captain or other picketers why the picket line was crossed. Employees shall at all times remain available for dispatch by the Employers Communication Center, and immediately respond to patients or standby post locations as requested.

## ARTICLE 18 - NO DISCRIMINATION/NO HARASSMENT

### 18.1    Gender Intent
Whenever words denoting a specific gender are used in this Agreement they are intended and shall be construed to mean any gender with which a worker identifies.

### 18.2    No Discrimination/No Harassment/No Retaliation
A.  Neither the Employer nor the Union shall discriminate, harass, or retaliate in any way against an employee on account of race, color, creed, religion, national origin, sex, age, veteran status, sexual orientation, marital status, or disability or any other status protected by federal, state or local law.

B.  Sexual harassment as defined in the Equal Employment Opportunity Commission and California Department of Fair Employment and Housing standards is prohibited and any instance of sexual harassment will be treated in accordance with the policy and procedure handbook (Handbook Section 1 6/10).

## ARTICLE 19 - SUCCESSOR CLAUSE

This Agreement shall be binding upon its successors, and assigns.  The Employer shall give the Union fifteen (15) days prior to any sale or closure to a purchaser, lessee or assignee.

## ARTICLE 20 - DRUG-FREE WORKPLACE

The Employer and the Union agree that all Bargaining Unit members shall be subject to the Medic Ambulance Drug and Alcohol Policy (Handbook Section 5 dated 6/10), with the following exceptions:

1.    Any Employee who tests positive for drugs and/or alcohol following a post-vehicular accident or a reasonable suspicion test shall be subject to discipline, even if the Employee has prior to the test admitted and sought help for a drug and/or alcohol problem.

30

2.  Reasonable suspicion testing shall be the exclusive type of drug and alcohol testing to be used under this policy.

a.  An employee who is suspected of being under the influence of alcohol or drugs in the workplace, or while on duty, may be required to undergo an alcohol or drug test. Reasonable suspicion means suspicion based on specific personal observations by a manager or supervisor concerning the appearance, behavior, speech, or breath odor of the employee. Observation by a manager or supervisor of any of the following may give rise to a reasonable suspicion of belief that an employee is under the influence of drugs or alcohol:

1.  Drug or alcohol use or possession and/or the physical symptoms of being under the influence of a drug or alcohol;
2.  Incoherent or slurred speech;
3.  Odor of alcohol on the breath;
4.  Inability to respond appropriately to questions an employee should reasonably be capable of answering;
5.  Unsteady walking and movement, disorientation or loss of balance;
6.  Physical symptoms of alcohol or drug influence (red and watery eyes, if not explained by environmental causes); or
7.  A pattern of abnormal, erratic, paranoid or bizarre behavior.

b.  One of the goals of this drug-free workplace policy is to encourage employees to voluntarily seek assistance with alcohol and/or drug problems. In so doing, employees shall be entitled to, prior to placing themselves into service, voluntarily seek assistance under this policy without the threat of discipline.

## ARTICLE 21 - PERSONNEL FILES

Employee's shall have the right to access and review their personnel file upon written request to Administration. Within twenty four (24) hours of receipt of written request an appointment during normal business hours will be scheduled, such appointment must occur within thirty (30) calendar days from the employee's written request. The review of the personnel file will take place in front of management personnel. The Employee may have a Union representative present as well. The Employee may request a photocopy of any document(s) within their personnel file, including the personnel file subject to any restrictions outlined in California Labor Code 1198.5, at no cost to the employee as long as any matter of a confidential nature is redacted. Information pertaining to an open and ongoing investigation shall not be available for review.

## ARTICLE 22-NO SUBCONTRACTING

During the term of this Agreement, the Employer shall not subcontract bargaining unit work, however in the event the Employer secures additional bargaining unit work and in order to initially staff-up to service the new work the Employer shall be entitled to subcontract for a period of no longer than sixty (60) days. In

31

such event the Employer needs additional time to initially staff-up to service the new work, the parties by mutual consent may extend the sixty (60) days' timeframe.

## ARTICLE 23 - ADMINISTRATIVE LEAVE

A.     The Employer may place employees on an unpaid administrative leave pending investigation into allegations of serious misconduct that could lead to corrective action of a multi-day suspension or greater. Employees shall be provided written notice of the reason for the investigation when placed on administrative leave. Employees shall also be advised of the obligation to cooperate in the investigation and remain available for an administrative interview while on administrative leave. Upon request from the Union, the Employer shall provide the Union with a copy of the written notice within twenty-four (24) hours.

B.     Employees shall be allowed to use one-half (1/2) of available accrued paid time off (PTO) while on administrative leave solely at the employee's option. However, employees placed on administrative leave following suspension of their clinical privileges by the State or Local EMS Agency or following an arrest for alleged serious criminal misconduct (felony) may be continued on unpaid administrative leave until completion of the EMS Agency or criminal proceedings.

C.     At the conclusion of the administrative leave, employees shall be returned to their regular assignments and/or served with notice of corrective action. If no corrective action is initiated, employees shall be fully reimbursed for all lost PTO and/or pay while on administrative leave. If less punitive corrective action is initiated, employees shall be reimbursed for the difference between any lost PTO and/or pay and the corrective action. Employees may grieve the corrective action as provided in this Agreement including the loss of PTO and/or pay while on administrative leave.

## ARTICLE 24 - DISASTERS / INCIDENTS

### 24.1   Local Disasters
In the event of a local disaster or catastrophe as declared by a governmental agency such as earthquake, fire, flood, explosion, widespread power failure or other acts of God outside the Employer's control that reasonably require all available employees to report for work, the provisions of this Agreement pertaining to scheduled paid time off, lunch and rest periods, job postings, shift changes, and transfers shall be suspended and the Employer shall be relieved of any obligation to adhere to those provisions during emergency operations. However, the Employer shall honor all prescheduled time off for employees who purchased non-refundable tickets or have made other non-recoverable economic commitments for use during their prescheduled time off. If the employee cannot be allowed the prescheduled time off, the Employer shall reimburse the employee for the cost of any unused non-refundable tickets and other non-recoverable economic impacts. Bargaining unit employees who are on duty when a disaster or catastrophe occurs shall be afforded every reasonable opportunity to ensure the welfare of their families.

### 24.2   Strike Teams
Should the Employer establish Ambulance Strike Teams or Medical Task Forces (hereinafter collectively "Strike Teams") in accordance with state of local guidelines or requirements, bargaining unit employees who participate on such Strike Teams shall receive the wages specified in this Agreement and shall be

32

covered by all other terms and conditions of this Agreement while participating in all Strike Team related activities, unless UEMSW and Medic Ambulance enter into a separate written agreement establishing alternative wage rates and conditions of employment for Strike Team members.

### 24.3   Stress Counseling
The Employer will continue to provide Critical Incident Stress management. Time spent on Critical Incident Stress Management Team duties will be paid as time worked.

# ARTICLE 25 - SCOPE OF AGREEMENT

### 25.1   Severability
This Agreement shall be subject to all applicable federal and state laws, and other appropriate rules and regulations of bona fide governmental authorities. Should any provisions of this Agreement be declared illegal or unenforceable by any court of competent jurisdiction or by any bona fide governmental authority, such action shall not invalidate the remainder of this Agreement. Such provision shall immediately become null and void, and shall cause the parties to meet and negotiate replacement provisions that are valid, leaving the remainder of the Agreement in full force and effect.

### 25.2   Policies, Procedures and Work Rules
This Agreement supersedes all policies, procedures and work rules previously established by the Employer with respect to the issues specifically incorporated herein covering the employment relationship between the Employer and bargaining unit employees.

### 25.3   Modifications to the Agreement
No addition to, alteration, modification, or waiver of any term, provision, covenant or condition or restriction in this agreement shall be valid, binding or of any force or effect unless mutually agreed to, in writing, by the Employer and the Union.

### 25.4   Complete Agreement
This Agreement sets forth the parties' agreement and understanding with respect to the matters referred to herein. The parties acknowledge that during the negotiations which resulted in this Agreement, each party had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.

Nothing contained herein shall prevent the parties, by mutual agreement, from negotiating on any subject matter, nor will it void any specific provisions in this Agreement that expressly provide for bargaining.

## ARTICLE 26 – DURATION

### 26.1    Term of Agreement

This Agreement shall remain in full force and effect from the ratification of this Agreement on April 26, 2014 through and including April 25, 2021 and shall continue in full force and effect from year to year thereafter unless notice of desire to amend or terminate the Agreement is served in writing by either party upon the other at least ninety (90) but no more than one hundred and twenty (120) days prior to the date of expiration.

SIGNATURE PAGE

FOR THE UNION:

_____
Larry Gerbone, Local Union President

Date: _____ 4/30/2014 _____

_____
Carl Catanzale, Chief Negotiator AFSCME

_____
Casey Veller

_____
Scott Williams

_____
Juan Bryant

_____
Wayne Scoles

FOR THE EMPLOYER:

_____
Ralph Michael, President/CEO

Date: _____

_____
Helen Pierson, CFO

_____
James Frances, VRM

35

# APPENDIX A SENIORITY LISTS
## (Anniversary Date, Classification and Shift Bid Seniority)

### EMTs
### Full-Time EMTs

| Employee Name | Anniversary Date | Classification | Shift Bid |
|---|---|---|---|
| Williams, Scott H | 8/1/1994 | 12/1/1994 | 12/1/1994 |
| McCarthy, Matthew P | 2/6/2002 | 2/6/2002 | 2/6/2002 |
| Bryant, Jason R | 10/11/2002 | 5/19/2005 | 3/19/2003 |
| Leland, Stith | 8/27/2003 | 10/3/2003 | 10/3/2003 |
| Scoles, Wayne | 4/16/2003 | 1/25/2005 | 1/25/2005 |
| Lincoln, Markus | 6/27/2005 | 8/18/2005 | 7/18/2005 |
| Mauerhan, William | 12/12/2006 | 12/31/2006 | 12/31/2006 |
| Colon, Michael | 11/1/2006 | 3/18/2007 | 1/17/2007 |
| Watson, Pamela | 1/31/2007 | 2/22/2007 | 2/22/2007 |
| Hallgren, Matthew | 1/2/2009 | 8/1/2007 | 8/1/2007 |
| Zook, Matt | 8/20/2007 | 11/1/2008 | 6/11/2008 |
| Eggert, Holli | 10/5/2009 | 10/23/2009 | 10/23/2009 |
| Smith, Brandon | 10/5/2009 | 10/27/2009 | 10/27/2009 |
| Taylor, Angelina | 7/26/2010 | 8/25/2010 | 8/25/2010 |
| Baroni, Scott | 10/5/2009 | 9/9/2010 | 9/19/2010 |
| Storts, Rory | 5/2/2011 | 6/22/2011 | 6/22/2011 |
| Sagun, John | 5/2/2011 | 7/1/2011 | 7/1/2011 |
| Thompson Bryan | 9/29/2011 | 11/12/2011 | 11/12/2011 |
| Gibson, Julia | 10/3/2011 | 11/15/2011 | 11/15/2011 |
| Pierson, Timothy | 9/30/2011 | 11/21/2011 | 11/21/2011 |
| Domingo, Marc | 1/30/2012 | 3/18/2012 | 3/18/2012 |
| Tsang, Gordon | 1/30/2012 | 4/3/2012 | 3/23/2012 |
| Robinson, Michael | 11/2/2011 | 6/1/2012 | 6/1/2012 |
| Cortes, Francisco | 4/16/2012 | 10/12/2012 | 10/12/2012 |
| Humphries, Sam | 9/30/2011 | 10/15/2012 | 4/21/2012 |
| Tomei, Michael | 10/24/2012 | 10/26/2012 | 10/26/2012 |
| Bettencourt, Jon | 10/24/2012 | 10/26/2012 | 10/26/2012 |
| Weber, Amber | 8/27/2012 | 11/12/2012 | 11/12/2012 |
| Reustle, Kevin | 10/24/2012 | 11/12/2012 | 11/12/2012 |
| Miller, Michael | 10/24/2012 | 11/15/2012 | 11/15/2012 |
| Pond, Nick | 10/10/2012 | 10/26/2012 | 11/28/2012 |
| Kelly, Eric | 10/24/2012 | 12/11/2012 | 12/11/2012 |
| Hill, Justin | 12/12/2012 | 1/15/2013 | 1/15/2013 |
| Moraida, Kevin | 1/15/2013 | 2/16/2013 | 2/16/2013 |
| Johnson, Tyler | 1/15/2013 | 2/25/2013 | 2/25/2013 |
| Nicholas, Dustin | 8/14/2012 | 3/12/2013 | 1/12/2013 |
| Anderson, Dustin | 2/26/2013 | 3/22/2013 | 11/5/2013 |

| Employee Name | Anniversary Date | Classification | Shift Bid |
|---|---|---|---|
| Bounds, Gregory | 1/30/2012 | 5/15/2013 | 12/15/2012 |
| Silva, Ryan | 2/09/2006 | 5/21/2013 | 5/21/2013 |
| Wheelen, Pete | 4/4/2013 | 6/1/2013 | 6/1/2013 |
| Harris, Alana | 4/4/2013 | 6/2/2013 | 6/2/2013 |
| Davis, Scott | 6/13/2013 | 7/20/2013 | 7/20/2013 |
| Walker, Candace | 6/13/2013 | 7/21/2013 | 7/21/2013 |
| Connelly, Kenneth | 7/24/2013 | 8/21/2013 | 8/21/2013 |
| Pizzimenti, Brian | 7/16/2013 | 8/24/2013 | 8/24/2013 |
| Anderson, David | 7/24/2013 | 8/26/2013 | 8/26/2013 |
| Roath, Meghan | 8/26/2011 | 9/15/2013 | 9/15/2013 |
| Welcker, Annica | 6/13/2013 | 11/15/2013 | 11/15/2013 |
| Fink, Andrew | 6/13/2013 | 11/16/2013 | 11/16/2013 |
| Zimmerman, Eric | 5/30/2012 | 11/22/2013 | 3/22/2013 |
| Vouchilas, Theresa | 12/3/2012 | 12/2/2013 | 6/12/2013 |
| Sturdee, Christian | 10/8/2013 | 12/4/2013 | 12/4/2013 |

## Part-Time EMTs

| Employee Name | Anniversary Date | Classification | Shift Bid |
|---|---|---|---|
| Newton, Jason | 2/22/2011 | | 10/5/2011 |
| Skuba, Travis | 10/3/2011 | | 6/1/2012 |
| Young, Ryan | 2/22/2011 | | 8/1/2012 |
| Bryan, Rich | 5/10/2012 | | 10/1/2012 |
| Munoz, Anthony | 2/23/2011 | | 10/15/2012 |
| Shields, Michael | 8/14/2012 | | 3/20/2013 |
| Carthy, Derek | 6/12/2012 | | 4/1/2013 |
| Gregory, Eric | 4/17/2012 | | 5/20/2013 |
| Williams, Kyle | 6/12/2012 | | 6/4/2013 |
| Moore, Mason | 1/15/2013 | | 6/10/2013 |
| Salo, Michael | 12/12/2012 | | 6/20/2013 |
| Cox, Daniel | 7/26/2012 | | 8/15/2013 |
| Jeppson, Forrest | 6/13/2013 | | 12/5/2013 |

37

PARAMEDICS
Full-Time Paramedics

| Employee Name | Anniversary Date | Classification | Shift Bid |
|---|---|---|---|
| Wood, Scott W | 8/12/1998 | 8/12/1996 | 8/12/1998 |
| Fenwick, Michael | 10/30/1996 | 2/1/1999 | 2/1/1999 |
| Watson, Barbara | 10/3/2001 | 10/25/2001 | 10/25/2001 |
| Kirkland, Christopher | 7/16/2002 | 11/3/2002 | 9/6/2003 |
| Bonn, Nicole | 6/07/2000 | 3/10/2004 | 4/10/2004 |
| Henderson, Cliff | 11/30/2004 | 8/11/2004 | 11/18/2007 |
| Dequattro, Joseph | 12/27/2005 | 1/17/2006 | 11/2/2009 |
| Hughry, Alan | 5/3/2003 | 11/11/2006 | 11/11/2006 |
| Billo, Nathan | 10/3/2007 | 10/29/2007 | 10/29/2007 |
| Larowe, Ryan | 9/6/2006 | 5/12/2008 | 11/12/2007 |
| Kunstman, Tim | 11/18/2008 | 12/16/2008 | 12/16/2008 |
| Vanier, Casey | 11/7/2007 | 2/14/2009 | 2/14/2009 |
| Torres, Danny | 4/13/2008 | 2/1/2009 | 3/19/2012 |
| Holt, Eric | 12/10/2007 | 1/29/2010 | 2/15/2009 |
| Balmer, Christopher | 9/6/2006 | 6/25/2010 | 6/25/2010 |
| Pinkhasov, Maria | 12/7/2010 | 2/12/2011 | 4/15/2011 |
| Arnold, Matt | 1/11/2010 | 8/1/2011 | 3/1/2012 |
| Lehman, Nick | 10/7/2011 | 11/3/2011 | 4/11/2012 |
| Hoyle, John | 10/3/2011 | 11/24/2011 | 11/24/2011 |
| Stinnett, Cory | 10/3/2011 | 1/15/2012 | 1/15/2012 |
| Dunagan, Christian | 6/12/2012 | 7/16/2012 | 7/16/2012 |
| Rubin, Nick | 6/12/2012 | 8/1/2012 | 8/1/2012 |
| Garrett, Ryan | 2/22/2011 | 8/11/2012 | 5/17/2012 |
| White, Billy | 8/26/2011 | 9/27/2012 | 9/27/2012 |
| Paulson, Eric | 12/12/2012 | 1/19/2013 | 1/19/2013 |
| Cutino, Joseph | 1/15/2013 | 2/28/2013 | 2/28/2013 |
| Thoming, Josh | 3/25/2013 | 4/26/2013 | 4/26/2013 |
| Murphy, Ryan | 7/16/2013 | 9/10/2013 | 9/10/2013 |
| Shires, Trayce | 7/16/2013 | 10/1/2013 | 10/1/2013 |
| Courter, Justin | 10/3/2013 | 11/23/2013 | 11/23/2013 |
| Morse, Tyler | 10/7/2013 | 11/24/2013 | 11/24/2013 |
| Fujimoto, Steven | 10/17/2013 | 12/1/2013 | 12/1/2013 |
| Elton, Christopher | 10/7/2013 | 12/6/2013 | 12/6/2013 |
| Goodreau, Josh | 12/4/2013 | 1/17/2014 | 1/17/2014 |
| Sack, Ryan | 12/10/2013 | 1/23/2014 | 1/23/2014 |
| Tequida, Martin | 1/31/2012 | 2/25/2014 | 2/25/2014 |
| Groosman, Aaron | 1/20/2014 | 3/8/2014 | 3/8/2014 |
| Dayoan, Micah | 1/20/2014 | 3/15/2014 | 3/15/2014 |
| Thomas, Daniel | 8/26/2011 | 3/26/2014 | 3/26/2014 |

38

## Part-time Paramedics

| Employee Name | Anniversary Date | Classification | Shift Bid |
|---|---|---|---|
| Hoytt, David | 10/3/2007 | | |
| Blauser, Brian | 11/7/2007 | | 11/1/2007 |
| Mihelich, Bryan | 8/3/2009 | | 2/5/2011 |
| Burke, Joel | 6/12/2012 | | 2/1/2012 |
| Reinthaler, Matt | 12/8/2010 | | 1/10/2012 |
| Untalan, William | 10/3/2011 | | 1/19/2013 |
| Eisan, Nicholas | 1/12/2011 | | 2/19/2013 |
| Etchieson, Max | 11/09/2001 | | 3/15/2013 |
| Perlstein, Alex | 4/4/2013 | | 11/20/13 |
| Rosecrans, Megan | 6/12/2012 | | 7/10/2013 |
| Murphy, Matt | 2/22/2011 | | 10/26/2012 |
| Webster, Randy | 10/3/2011 | | 4/10/2014 |
| | | | 2/28/2012 |

# DISPATCHERS
## Full-Time Dispatchers

| Employee Name | Anniversary Date | Classification | Shift Bid |
|---|---|---|---|
| Hervery, Roseann | 2/22/2000 | 2/7/2001 | 7/1/2006 |
| Carrie, Tatiana | 5/23/2011 | 7/30/2011 | 7/30/2011 |
| Messer, Cameron | 5/23/2011 | 8/27/2011 | 8/27/2011 |
| Corino, Mark | 10/3/2011 | 11/5/2011 | 11/5/2011 |
| Wilson, Gregory | 2/15/2012 | 3/21/2012 | 3/21/2012 |
| Corse, Carolyn | 7/26/2012 | 9/12/2012 | 9/12/2012 |
| McCoy, Matthew | 5/8/2013 | 7/11/2013 | 7/11/2013 |
| Walker, Natasha | 8/14/2013 | 10/3/2013 | 10/3/2013 |
| Ruggiero, Brigetta | 8/14/2013 | 10/2/2013 | 10/2/2013 |
| Travillon, Greg | 4/23/2005 | 12/21/2013 | 12/21/2013 |
| Higgins, Austin | 2/29/2012 | 2/18/2004 | 2/18/2014 |

## Part-Time Dispatchers

| | | | |
|---|---|---|---|
| Tuss, Andrew | 2/22/2011 | 4/12/2013 | 5/25/2013 |

39

## SSTS

| Employee Name | Anniversary Date | Full-Time SSTS Classification | Shift Bid |
|---|---|---|---|
| Gentry, Wanda | 8/12/2003 | 8/20/2003 | 8/20/2003 |
| Whaley, Ryan | 4/2/2012 | 9/10/2012 | 7/1/2012 |
| Cibotti, Phillip | 10/3/2013 | 11/17/2013 | 11/17/2013 |
| Fortier, Christian | 10/22/2013 | 11/18/2013 | 11/18/2013 |
| Baird, Brandon | 7/16/2013 | 1/23/2014 | 1/23/2014 |
| Hutchinson, Joshua | 1/24/2014 | 4/9/2014 | 3/15/2014 |

### Part-Time SSTS

| | | | |
|---|---|---|---|
| Diez, Michael | 3/25/2011 | | 11/15/2012 |

40

# APPENDIX B - WAGE SCALES

1.25%
Ratification

## MEDIC EMTs

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 13.56 | $ 14.10 | $ 14.67 | $ 15.26 | $ 15.87 | $ 16.50 | $ 17.16 | $ 18.54 | $ 19.28 |
| TWELVE/A2 | $ 18.49 | $ 19.23 | $ 20.00 | $ 20.80 | $ 21.63 | $ 22.49 | $ 23.39 | $ 25.26 | $ 26.27 |
| TEN/A10 | $ 18.49 | $ 19.23 | $ 20.00 | $ 20.80 | $ 21.63 | $ 22.49 | $ 23.39 | $ 25.26 | $ 26.27 |

## MEDIC PARAMEDICS

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 19.10 | $ 19.86 | $ 20.64 | $ 21.48 | $ 22.34 | $ 23.23 | $ 24.16 | $ 26.09 | $ 27.14 |
| TWELVE/A2 | $ 23.70 | $ 24.65 | $ 25.64 | $ 26.66 | $ 27.72 | $ 28.84 | $ 29.99 | $ 32.38 | $ 33.68 |

## MEDIC DISPATCHERS

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| TWELVE/A2 | $ 16.25 | $ 16.90 | $ 17.58 | $ 18.28 | $ 19.00 | $ 19.76 | $ 20.55 | $ 22.20 | $ 23.09 |
| Non-EMD | $ 14.77 | | | | | | | | |

## MEDIC SSTs

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. |
|---|---|---|---|---|---|---|---|
| TWELVE/A2 | $ 13.55 | $ 14.08 | $ 14.65 | $ 15.24 | $ 15.85 | $ 16.48 | $ 17.14 |

41

1.25%
9/1/2014

### MEDIC EMTs

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 13.73 | $ 14.28 | $ 14.85 | $ 15.45 | $ 16.06 | $ 16.71 | $ 17.38 | $ 18.77 | $ 19.52 |
| TWELVE/42 | $ 18.72 | $ 19.47 | $ 20.25 | $ 21.06 | $ 21.90 | $ 22.77 | $ 23.68 | $ 25.58 | $ 26.60 |
| TEN/40 | $ 18.72 | $ 19.47 | $ 20.25 | $ 21.06 | $ 21.90 | $ 22.77 | $ 23.68 | $ 25.58 | $ 26.60 |

### MEDIC PARAMEDICS

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 19.33 | $ 20.10 | $ 20.90 | $ 21.74 | $ 22.61 | $ 23.52 | $ 24.46 | $ 25.42 | $ 27.47 |
| TWELVE/42 | $ 24.00 | $ 24.96 | $ 25.96 | $ 26.99 | $ 28.07 | $ 29.20 | $ 30.37 | $ 32.78 | $ 34.10 |

### MEDIC DISPATCHERS

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 16.45 | $ 17.11 | $ 17.80 | $ 18.50 | $ 19.24 | $ 20.01 | $ 20.81 | $ 22.48 | $ 23.37 |
| Non-EMD | $ 14.96 | | | | | | | | |

### MEDIC SSTs

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. |
|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 13.72 | $ 14.26 | $ 14.83 | $ 15.43 | $ 16.04 | $ 16.69 | $ 17.36 |

42

1.25%
9/1/2015

**MEDIC EMTs**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 13.90 | $ 14.46 | $ 15.04 | $ 15.64 | $ 16.27 | $ 16.92 | $ 17.59 | $ 19.01 | $ 19.76 |
| TWELVE/42 | $ 18.95 | $ 19.71 | $ 20.50 | $ 21.32 | $ 22.17 | $ 23.05 | $ 23.98 | $ 25.90 | $ 26.94 |
| TEN/40 | $ 18.95 | $ 19.71 | $ 20.50 | $ 21.32 | $ 22.17 | $ 23.05 | $ 23.98 | $ 25.90 | $ 26.94 |

**MEDIC PARAMEDICS**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 19.58 | $ 20.35 | $ 21.16 | $ 22.02 | $ 22.90 | $ 23.81 | $ 24.77 | $ 26.75 | $ 27.82 |
| TWELVE/42 | $ 24.30 | $ 25.27 | $ 26.28 | $ 27.33 | $ 28.42 | $ 29.56 | $ 30.74 | $ 33.19 | $ 34.52 |

**MEDIC DISPATCHERS**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 16.66 | $ 17.32 | $ 18.02 | $ 18.74 | $ 19.48 | $ 20.26 | $ 21.07 | $ 22.76 | $ 23.67 |
| Non-EMD | $ 15.14 | | | | | | | | |

**MEDIC SSTs**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73+ Mo. |
|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 13.89 | $ 14.44 | $ 15.02 | $ 15.62 | $ 16.24 | $ 16.90 | $ 17.57 |

43

1.25%
9/1/2016

**MEDIC EMTs**

| Shift/Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 14.07 | $ 14.64 | $ 15.23 | $ 15.84 | $ 16.47 | $ 17.13 | $ 17.81 | $ 19.24 | $ 20.01 |
| TWELVE/42 | $ 19.19 | $ 19.96 | $ 20.76 | $ 21.59 | $ 22.45 | $ 23.34 | $ 24.28 | $ 26.22 | $ 27.27 |
| TEN/40 | $ 19.19 | $ 19.96 | $ 20.76 | $ 21.59 | $ 22.45 | $ 23.34 | $ 24.28 | $ 26.22 | $ 27.27 |

**MEDIC PARAMEDICS**

| Shift/Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 19.82 | $ 20.61 | $ 21.43 | $ 22.29 | $ 23.19 | $ 24.11 | $ 25.08 | $ 27.08 | $ 28.17 |
| TWELVE/42 | $ 24.60 | $ 25.59 | $ 26.61 | $ 27.67 | $ 28.77 | $ 29.93 | $ 31.13 | $ 33.61 | $ 34.95 |

**MEDIC DISPATCHERS**

| Shift/Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 16.87 | $ 17.54 | $ 18.26 | $ 18.97 | $ 19.73 | $ 20.51 | $ 21.33 | $ 23.05 | $ 23.96 |
| Non-EMD | $ 15.33 | | | | | | | | |

**MEDIC SSTs**

| Shift/Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. |
|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 14.06 | $ 14.62 | $ 15.21 | $ 15.82 | $ 16.45 | $ 17.11 | $ 17.79 |

125%
9/1/2017

**MEDIC EMTs**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | steps 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 14.35 | $ 14.82 | $ 15.42 | $ 16.04 | $ 16.67 | $ 17.34 | $ 18.04 | $ 19.48 | $ 20.26 |
| TWELVE/42 | $ 19.43 | $ 20.21 | $ 21.02 | $ 1.86 | $ 22.73 | $ 2.363 | $ 24.58 | $ 26.55 | $ 27.61 |
| TEN/40 | $ 19.43 | $ 20.21 | $ 21.02 | $ 1.86 | $ 22.75 | $ 2.363 | $ 24.58 | $ 26.55 | $ 27.61 |

**MEDIC PARAMEDICS**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | steps 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 20.07 | $ 20.87 | $ 21.70 | $ 22.57 | $ 23.47 | $ 24.41 | $ 25.39 | $ 27.42 | $ 28.52 |
| TWELVE/42 | $ 24.91 | $ 25.91 | $ 26.94 | $ 28.02 | $ 29.13 | $ 30.31 | $ 3.152 | $ 34.03 | $ 35.39 |

**MEDIC DISPATCHERS**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | steps 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| TWELVE/42 Non EMD | $ 17.08 | $ 17.76 | $ 18.47 | $ 19.21 | $ 19.97 | $ 20.77 | $ 2.40 | $ 21.34 | $ 24.26 |
|  | 15.52 |  |  |  |  |  |  |  |  |

**MEDIC SSFs**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | steps 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73+ Mo. |
|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 14.24 | $ 14.80 | $ 15.40 | $ 16.01 | $ 16.65 | $ 17.32 | $ 18.01 |

1.25%
9/1/1018

**MEDIC EMTs**

| Shift/Type | Step 1 0-12 Mo | step 2 13-24 Mo | Step 3 25-36 Mo | Step 4 37-48 Mo | step 5 49-60 Mo | Step 6 61-72 Mo | Step 7 73-84 Mo | step 8 85-108 Mo | Step 9 109+ Mo |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 14.43 | $ 15.01 | $ 15.61 | $ 16.4 | $ 16.88 | $ 17.56 | $ 18.26 | $ 19.73 | $ 20.51 |
| TWELVE/42 | $ 19.67 | $ 20.46 | $ 21.28 | $ 22.13 | $ 23.03 | $ 23.93 | $ 24.89 | $ 16.88 | $ 27.96 |
| TEN/40 | $ 19.67 | $ 20.46 | $ 21.28 | $ 22.13 | $ 23.03 | $ 23.93 | $ 24.89 | $ 26.88 | $ 27.96 |

**MEDIC PARAMEDICS**

| Shift/Type | Step 1 0-12 Mo | step 2 13-24 Mo | Step 3 25-36 Mo | Step 4 37-48 Mo | step 5 49-60 Mo | Step 6 61-72 Mo | Step 7 73-84 Mo | step 8 85-108 Mo | Step 9 109+ Mo |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 20.32 | $ 21.13 | $ 21.97 | $ 22.85 | $ 23.77 | $ 24.71 | $ 25.71 | $ 4.776 | $ 28.87 |
| TWELVE/42 | $ 25.12 | $ 16.13 | $ 27.28 | $ 287 | $ 29.50 | $ 30.68 | $ 31.91 | $ 34.45 | $ 35.83 |

**MEDIC DISPATCHERS**

| Shift/Type | Step 1 0-12 Mo | step1 13-24 Mo | Step 3 25-36 Mo | Step 4 37-48 Mo | step 5 49-60 Mo | Step 6 61-72 Mo | Step 7 73-84 Mo | Step 8 85-108 Mo | Step 9 109+ Mo |
|---|---|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 17.19 | $ 17.98 | $ 18.70 | $ 19.45 | $ 20.22 | $ 21.03 | $ 21.87 | $ 23.63 | $ 24.56 |
| Non-EMD | $ 15.72 | | | | | | | | |

**MEDIC SSTs**

| Shift/Type | Step 1 0-12 Mo | step1 13-24 Mo | Step 3 25-36 Mo | Step 4 37-48 Mo | step 5 49-60 Mo | Step 6 61-72 Mo | Step 7 73+ Mo |
|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 14.42 | $ 14.99 | $ 15.59 | $ 16.1 | $ 16.86 | $ 17.94 | $ 18.24 |

46

1.25%
9/1/2019

**MEDIC EMTs**

| Shift/Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 14.61 | $ 15.20 | $ 15.81 | $ 16.44 | $ 17.09 | $ 17.78 | $ 18.49 | $ 19.97 | $ 20.77 |
| TWELVE/A2 | $ 19.92 | $ 20.72 | $ 21.54 | $ 22.41 | $ 23.30 | $ 24.23 | $ 25.20 | $ 27.22 | $ 28.31 |
| TEN/A0 | $ 19.92 | $ 20.72 | $ 21.54 | $ 22.41 | $ 23.30 | $ 24.23 | $ 25.20 | $ 27.22 | $ 28.31 |

**MEDIC PARAMEDICS**

| Shift/Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 20.57 | $ 21.39 | $ 22.24 | $ 23.14 | $ 24.06 | $ 25.02 | $ 26.03 | $ 28.11 | $ 29.23 |
| TWELVE/A2 | $ 25.54 | $ 26.56 | $ 27.62 | $ 28.72 | $ 29.87 | $ 31.07 | $ 32.31 | $ 34.89 | $ 36.28 |

**MEDIC DISPATCHERS**

| Shift/Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| TWELVE/A2 | $ 17.51 | $ 18.21 | $ 18.94 | $ 19.69 | $ 20.48 | $ 21.29 | $ 22.14 | $ 23.92 | $ 24.87 |
| Non-EMD | $ 15.92 | | | | | | | | |

**MEDIC SSTs**

| Shift/Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 63-72 Mo. | Step 7 73-84 Mo. |
|---|---|---|---|---|---|---|---|
| TWELVE/A2 | $ 14.60 | $ 15.17 | $ 15.78 | $ 16.42 | $ 17.07 | $ 17.76 | $ 18.47 |

47

1.25%
9/1/2020

**MEDIC EMTs**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 14.79 | $ 15.39 | $ 16.21 | $ 16.85 | $ 17.52 | $ 18.22 | $ 18.95 | $ 20.47 | $ 21.29 |
| TWELVE/42 | $ 20.42 | $ 21.24 | $ 22.08 | $ 22.97 | $ 23.88 | $ 24.84 | $ 25.83 | $ 27.90 | $ 29.02 |
| TEN/40 | $ 20.42 | $ 21.24 | $ 22.08 | $ 22.97 | $ 23.88 | $ 24.84 | $ 25.83 | $ 27.90 | $ 29.02 |

**MEDIC PARAMEDICS**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| 24/48 | $ 21.08 | $ 21.92 | $ 22.80 | $ 23.72 | $ 24.56 | $ 25.65 | $ 26.69 | $ 28.81 | $ 29.96 |
| TWELVE/42 | $ 26.18 | $ 27.22 | $ 28.31 | $ 29.44 | $ 30.62 | $ 31.85 | $ 33.12 | $ 35.76 | $ 37.19 |

**MEDIC DISPATCHERS**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73-84 Mo. | Step 8 85-108 Mo. | Step 9 109+ Mo. |
|---|---|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 17.95 | $ 18.67 | $ 19.41 | $ 20.18 | $ 20.99 | $ 21.82 | $ 22.69 | $ 24.52 | $ 25.49 |
| Non-EMD | $ 16.32 | | | | | | | | |

**MEDIC SSTs**

| Shift Type | Step 1 0-12 Mo. | Step 2 13-24 Mo. | Step 3 25-36 Mo. | Step 4 37-48 Mo. | Step 5 49-60 Mo. | Step 6 61-72 Mo. | Step 7 73 Mo. |
|---|---|---|---|---|---|---|---|
| TWELVE/42 | $ 14.97 | $ 15.55 | $ 16.17 | $ 16.83 | $ 17.50 | $ 18.20 | $ 18.93 |

# APPENDIX C - WAGE SCALE SENIORITY LIST

| Employee Name | EMTs<br>Full-Time EMTs<br>Wage Scale |
|---|---|
| Williams, Scott H | 12/1/1994 |
| McCarthy, Matthew P | 2/6/2002 |
| Bryant, Jason R | 3/19/2003 |
| Leland, Stith | 10/3/2003 |
| Scoles, Wayne | 1/25/2005 |
| Lincoln, Markus | 7/18/2005 |
| Mauerhan, William | 12/31/2006 |
| Colon, Michael | 1/17/2007 |
| Watson, Pamela | 2/22/2007 |
| Hallgren, Matthew | 8/1/2007 |
| Zook, Matt | 6/11/2008 |
| Eggert, Holli | 10/23/2009 |
| Smith, Brandon | 10/27/2009 |
| Taylor, Angelina | 8/25/2010 |
| Baroni, Scott | 9/19/2010 |
| Storts, Rory | 6/22/2011 |
| Sagun, John | 7/1/2011 |
| Thompson Bryan | 11/12/2011 |
| Gibson, Julia | 11/15/2011 |
| Pierson, Timothy | 11/21/2011 |
| Domingo, Marc | 3/18/2012 |
| Tsang, Gordon | 3/23/2012 |
| Humphries, Sam | 4/21/2012 |
| Robinson, Michael | 6/1/2012 |
| Cortes, Francisco | 10/12/2012 |
| Tomei, Michael | 10/26/2012 |
| Bettencourt, Jon | 10/26/2012 |
| Weber, Amber | 11/12/2012 |
| Reustle, Kevin | 11/12/2012 |
| Miller, Michael | 11/15/2012 |
| Pond, Nick | 11/28/2012 |
| Kelly, Eric | 12/11/2012 |
| Bounds, Gregory | 12/15/2012 |
| Nicholas, Dustin | 1/12/2013 |
| Hill, Justin | 1/15/2013 |
| Moraida, Kevin | 2/16/2013 |
| Johnson, Tyler | 2/25/2013 |
| Zimmerman, Eric | 3/22/2013 |

| Employee Name | Wage Scale |
|---|---|
| Silva, Ryan | 5/21/2013 |
| Wheelen, Pete | 6/1/2013 |
| Harris, Alana | 6/2/2013 |
| Vouchilas, Theresa | 6/12/2013 |
| Davis, Scott | 7/20/2013 |
| Walker, Candace | 7/21/2013 |
| Connelly, Kenneth | 8/21/2013 |
| Pizzimenti, Brian | 8/24/2013 |
| Anderson, David | 8/26/2013 |
| Roath, Meghan | 9/15/2013 |
| Anderson, Dustin | 11/5/2013 |
| Welcker, Annica | 11/15/2013 |
| Fink, Andrew | 11/16/2013 |
| Sturdee, Christian | 12/4/2013 |

## Part-Time EMTs

| Employee Name | Wage Scale |
|---|---|
| Newton, Jason | 10/5/2011 |
| Skuba, Travis | 6/1/2012 |
| Young, Ryan | 8/1/2012 |
| Bryan, Rich | 10/1/2012 |
| Munoz, Anthony | 10/15/2012 |
| Shields, Michael | 3/20/2013 |
| Carthy, Derek | 4/1/2013 |
| Gregory, Eric | 5/20/2013 |
| Williams, Kyle | 6/4/2013 |
| Moore, Mason | 6/10/2013 |
| Salo, Michael | 6/20/2013 |
| Cox, Daniel | 8/15/2013 |
| Jeppson, Forrest | 12/5/2013 |

50

## PARAMEDICS
### Full-Time Paramedics

| Employee Name | Wage Scale |
|---|---|
| Wood, Scott W | 8/12/1998 |
| Fenwick, Michael | 2/1/1999 |
| Watson, Barbara | 10/25/2001 |
| Kirkland, Christopher | 9/6/2003 |
| Bonn, Nicole | 4/10/2004 |
| Hughry, Alan | 11/11/2006 |
| Billo, Nathan | 10/29/2007 |
| Larowe, Ryan | 11/12/2007 |
| Henderson, Cliff | 11/18/2007 |
| Kunstman, Tim | 12/16/2008 |
| Vanier, Casey | 2/14/2009 |
| Holt, Eric | 2/15/2009 |
| Dequattro, Joseph | 11/2/2009 |
| Balmer, Christopher | 6/25/2010 |
| Pinkhasov, Maria | 4/15/2011 |
| Hoyle, John | 11/24/2011 |
| Stinnett, Cory | 1/15/2012 |
| Arnold, Matt | 3/1/2012 |
| Torres, Danny | 3/19/2012 |
| Lehman, Dick | 4/11/2012 |
| Garrett, Ryan | 5/17/2012 |
| Dunagan, Christian | 7/16/2012 |
| Rubin, Nick | 8/1/2012 |
| White, Billy | 9/27/2012 |
| Paulson, Eric | 1/19/2013 |
| Cutino, Joseph | 2/28/2013 |
| Thorning, Josh | 4/26/2013 |
| Murphy, Ryan | 9/10/2013 |
| Shires, Trayce | 10/1/2013 |
| Courter, Justin | 11/23/2013 |
| Morse, Tyler | 11/24/2013 |
| Fujimoto, Steven | 12/1/2013 |
| Elton, Christopher | 12/6/2013 |
| Goodreau, Josh | 1/17/2014 |
| Ryan, Sack | 1/23/2014 |
| Tequida, Martin | 2/25/2014 |
| Groosman, Aaron | 3/8/2014 |
| Dayoan, Micah | 3/15/2014 |
| Thomas, Daniel | 3/26/2014 |

51

## Part-time Paramedics

| Employee Name | Wage Scale |
|---|---|
| Hoytt, David | 11/1/2007 |
| Blauser, Brian | 2/5/2011 |
| Burke, Joel | 1/10/2012 |
| Mihelich, Bryan | 2/1/2012 |
| Webster, Randy | 2/28/2012 |
| Rosecrans, Megan | 10/26/2012 |
| Reinthaler, Matt | 1/19/2013 |
| Unfalan, William | 2/19/2013 |
| Eisan, Nicholas | 3/15/2013 |
| Perlstein, Alex | 7/10/2013 |
| Etchieson, Max | 11/20/2013 |
| Murphy, Matt | 4/10/2014 |

## DISPATCHERS
## Full-Time Dispatchers

| Employee Name | Wage Scale |
|---|---|
| Hervery, Roseann | 7/1/2006 |
| Carrie, Tatiana | 7/30/2011 |
| Messer, Cameron | 8/27/2011 |
| Corino, Mark | 11/5/2011 |
| Wilson, Gregory | 3/21/2012 |
| Corse, Carolyn | 9/12/2012 |
| McCoy, Matthew | 7/11/2013 |
| Ruggiero, Brigetta | 10/2/2013 |
| Walker, Natasha | 10/3/2013 |
| Travillon, Greg | 12/21/2013 |
| Higgins, Austin | 2/18/2014 |

## Part-time Dispatchers

| | |
|---|---|
| Tuss, Andrew | 5/25/2013 |

52

SSTS
Full-Time SSTS

| Employee Name | Wage Scale |
|---|---|
| Gentry, Wanda | 8/20/2003 |
| Whaley, Ryan | 7/1/2012 |
| Cibotti, Phillip | 11/17/2013 |
| Fortier, Christian | 11/18/2013 |
| Baird, Brandon | 1/23/2014 |
| Hutchinson, Joshua | 3/15/2014 |

Part-Time SSTS

| | |
|---|---|
| Diez, Michael | 11/15/2012 |

53

EXHIBIT B

ARBITRATION

BEFORE

PORTIA K. IGARASHI

_____ )
In the Matter of:                )
UNITED EMS WORKERS, AFSCME       )
LOCAL 4911,                      )
                                 )       FMCS CASE
                      Union,     )       NO. **160624-56110-A**
                                 )
            v.                   )
MEDIC AMBULANCE SERVICE,         )
                                 )
                   Employer.     )       <u>June 11, 2017</u>
                                 )     _____
_____ )

<u>Manuel A. Boigues</u>, Esquire, Alameda, California, for the Union.

<u>Patrick W. Jordan,</u> Esquire, San Rafael, California, for the Employer.


### <u>DECISION</u>

The arbitration hearing in this matter was held in Vallejo, California on November 21, 2016, and February 17, 2017, and per agreement of the parties, the record was held open until April 12, 2017, for written closing arguments. For the reasons stated below, the Union's grievance is GRANTED.


### <u>ANALYSIS AND FINDINGS</u>

## Background Facts

Medic Ambulance Company (Employer) is the exclusive provider of emergency medical transportation for Solano County excluding the city of Vacaville. Its contractual responsibility to the County requires that it makes sure that its ambulances arrive on a timely basis to assist with medical emergencies. To ensure a timely response the Employer must maintain adequate staffing to provide the necessary coverage including times where there are gaps due to staffing shortages, family emergencies, people quitting, calling in sick, or being injured. Hearing Transcript, Brian Meader and James Pierson testimonies. There are approximately 150 bargaining unit employees of which 80-90 are EMTs and Paramedics who work on 40-50 ambulances. Hearing Transcript, Brian Meader testimony.

In 2012, the employees engaged in an organizing drive that resulted in United EMS Workers, AFSCME Local 4911 (Union) becoming their collective bargaining representative. Negotiations for a new Collective Bargaining Agreement (CBA) commenced in August or September 2012, and did not conclude until mid-March 2014. Hearing Transcript, Casey Vanier, testimony.

Casey Vanier, Union Representative, who was a member of the Union's bargaining team at the time, testified that he attended almost all of the negotiation sessions and Article 10.10 of the CBA was the primary focus. He testified that the Union was very focused on the language in Article 10.10 (Mandatory Assignment of Overtime) because prior to this addition of this section to the CBA, employees were able to refuse mandated shifts without repercussions. Prior to the negotiations, James Pierson, the Employer's Vice President and Chief Operating Officer, had various conversations with Representative Vanier wherein he made it clear that the Employer wanted to address mandation during the bargaining process. He wanted to negotiate changes to the language so that the Employer could have the ability to mandate employees to work extra shifts. Hearing

Transcript, Casey Vanier testimony.

Representative Vanier testified that discussions at the bargaining table focused on employees being able to "find replacements or have somebody bid on the shift that they've been mandated for." He further testified that this was important to the Union because the employees were "going from a culture where people weren't mandated to a culture where they could be possibly mandated every other pay period" and the Union wanted the employees "to be able to find their own coverage, or for people to go in who were looking for overtime and work and bid on the shift that somebody had mandated and relieve them of that mandation". Hearing Transcript, Casey Vanier testimony.

The Employer's CrewScheduler is an electronic scheduling system that employees access to see what shifts are open and available for bidding. The system provides a method for part-time and full-time employees to be able to pick up additional work beyond their regular shifts. The system has been in use, at least since 2007, when Representative Vanier began work with the Employer. Hearing Transcript, Casey Vanier testimony. Vice President Pierson confirmed that the Employer began using CrewScheduler in 2007. Hearing Transcript, James Pierson testimony.

Using the CrewScheduler system, the employees can see a shift identifier from which employees are able to determine the shift hours, the location where the ambulance is scheduled to work out of, and what type of work the employees working that shift would be performing. By looking at the shift identifier which is the ambulance unit number, employees can tell all of the details of the shift. Hearing Transcript, Casey Vanier testimony.

In negotiations, the parties specifically discussed numerous times that mandated shifts needed to remain on CrewScheduler for employees to bid on them until the twelve hour mark before the start of the shift. Representative Vanier provided unrebutted testimony that the Employer through their negotiators Tim Bonifay, Administrator, and Vice President Pierson, agreed at the bargaining

table that mandated shifts would remain on CrewScheduler for other employees to bid on up to twelve hours before the start of the shift. Hearing Transcript, Casey Vanier testimony. Operations Manager Meader also testified that once an employee has been mandated to a shift, the shift is kept open on CrewScheduler for other employees to bid on. He explained that if a bid is placed on a mandated shift, the Employer then speaks with the mandated employee to determine if the employee wants to work the mandation or be relieved from it. Hearing Transcript, Brian Meader testimony.

The resultant CBA from the two year negotiations provides in pertinent part as follows:

### 10.10. Mandatory Assignment of Overtime

A.     Mandatory shifts

    1.     When the Employer is unable to fill an available shift through any other means other than a mandatory assignment to an Employee, Mandatory Assignments will be made in reverse seniority order. Employees will be given a minimum of seventy two (72) hours notice prior to mandatory shift. The Employer shall continue to strive to fill the mandated shift up to twelve (12) hours prior to the start of the shift requiring mandation. In the event the Employer is successful in filling the shift the Employer shall immediately communicate with the mandated employee and not require the employee to work the mandated shift.

    2.     When a Mandatory shift has been assigned, the Employee will be moved to the bottom of the list. If an Employee refuses to accept a mandatory shift assignment they will be subject to the following progressive discipline 1st offense=Written Warning 1st 2nd offense=one (1) day suspension, 3rd offense=Termination.

    3.     A continuing database of employees assigned mandatory shifts will be maintained by the Employer and available for review at all times, to ensure reverse seniority is maintained by assignment with the following guidelines:
        i.     No employee will be mandatoried more than one shift per two consecutive pay period block of time.

Joint Exhibit 1.

In conjunction with Article 10.10, Article 11.6 of the CBA provides the following:

11.6   <u>Filling Open Shifts</u>
A.     Available hours/shifts shall be defined as those hours/shifts, which are open.  Available hours filled as follows:
       1.     Part-time employees;
       2.     Full-time employees on the available list by seniority;
       3.     Any employee willing to accept the shift;
       4.     Any means available to the Employer (i.e., non-bargaining unit management personnel);
       5.     Mandatory call back in reversed order of seniority.

Joint Exhibit 1.

## Grievance

The grievance at issue was filed on April 15, 2016, alleging:

> The Employer needs to follow the CBA when assigning Mandatory Shifts.  On 4/1/16 it became evident the Employer decided to unilaterally implement a new interpretation of the applicable CBA article 10.10 for Mandatory Shifts, as well as the way in which the Shift is assigned/handed out, while also not allowing for found coverage, or another individual the opportunity to voluntarily bid on the Shift mandated to another employee.

Joint Exhibit 2.

Chief Shop Steward Eric Paulson testified that shortly after 8:00 am on March 31, 2016, he was contacted by bargaining unit member Robyn Hutson. Ms. Hutson had been mandated by the Employer to work "the shift of 209 from 0900-2100 out of the Vallejo station on Saturday, April 2nd, 2016."  Joint Exhibit 7.  Ms. Hutson told Mr. Paulson that she had found coverage for the April 2 shift

Page 5

that she had been mandated to work but when her co-worker, Andrew Fink, called the Employer to take the shift he was not allowed to take her mandated shift. Hearing Transcript, Eric Paulson testimony.

Chief Steward Paulson testified that he then called Operations Manager Meader who was in charge of scheduling and asked about the Ms. Hutson situation. Operations Manager Meader told him that Mr. Fink was not allowed to take Ms. Hutson's mandated shift because the Employer had hours or multiple open shifts that were still available and that Operations Manager Meader asked Mr. Fink to bid on one of the other shifts, specifically the 210 shift, which Mr. Fink did at Meader's direction. Chief Steward Paulson testified that he talked to Mr. Fink who informed him that he wanted to cover Ms. Hutson's mandated shift not shift 210. Chief Steward Paulson claims that he and Operations Manager Meader reached an agreement that Mr. Fink would withdraw his bid for shift 210, request Ms. Hutson's mandated 209 shift, and work that shift for her. Operations Manager Meader testified that he had not reached that agreement with Chief Steward Paulson. Hearing Transcript, Eric Paulson and Brian Meader testimonies.

Later in the day on March 31, 2016, Vice President Pierson called Chief Steward Paulson and told him that the agreement that he had reached with Operations Manager Meader was not going through because it was not an issue about open shifts but instead about open hours that were available to work on the day of Ms. Hutson's mandation. Hearing Transcript, Eric Paulson testimony. Operations Manager Meader and Vice President Pierson testified at hearing that hours and shifts are the same. Hearing Transcript, Brian Meader and James Pierson testimonies. Vice President Pierson told Chief Steward Paulson that Ms. Hutson needed to show up for the 209 shift that she had been mandated to work and that Mr. Fink needed to show up for the 210 shift that he had agreed to work. Hearing Transcript, Eric Paulson testimony.

Eventually, Ms. Hutson's mandated shift was resolved when Ms. Hutson agreed to work a later shift and another employee agreed to work the mandated

shift. Hearing Transcript, Eric Paulson testimony; Union Exhibit 1.

This grievance went to a Step 1 meeting on May 10, 2016, wherein the Union claimed that although Ms. Hutson had found coverage for her mandated shift, the Employer failed to allow the coworker who had agreed to take the shift to cover her mandation. At the Step 1 meeting, Administrator Bonifay stated that because the Employer had hours to fill the Employer did not allow Fink to relieve Ms. Hutson of the mandation and that the Employer needed to be able to cover openings. Hearing Transcript, Casey Vanier and Eric Paulson testimonies.

The Union also claimed at the Step 1 meeting that the Employer's decision to remove shift/unit identifiers starting around March 31, 2016, from the emails notifying employees of mandated shifts prevented other employees from going on CrewScheduler to bid on mandated shifts. Hearing Transcript, Casey Vanier and Eric Paulson testimonies. Chief Steward Paulson testified that every single mandation email sent to him before this change included the shift identifier. He argued that without the shift identifier in the mandated assignment, another employee cannot go on CrewScheduler to place a bid on the shift that has been mandated. Hearing Transcript, Eric Paulson testimony. The Employer argued at that meeting that because the Employer still had open shifts it was not going to allow other employees to bid on the mandated shifts as the hours needed to be filled and that the Employer was not violating the CBA because under Article 11.6, the Employer could mandate available hours without a shift identifier. It was the Employer's position that as long as the Employer had other shifts to fill, an employee could not bid on a mandated shift and could bid only on the shifts that remained open. Hearing Transcript, Casey Vanier and Eric Paulson testimonies.

The Employer denied the grievance on May 23, 2016. Joint Exhibit 5.

## Issue

**Did the Employer fail to comply with the grievance procedure?**

<u>Analysis</u>

The Union contends that the Employer failed to meet its obligation under Article 5.1, to schedule a Step 2 meeting within five (5) business days after the Union timely moved the grievance to Step 2. Article 5.1 of the CBA provides in pertinent part:

> **Step Two**
> If the procedure in Step One fails to resolve the grievance then, the grievance shall be submitted to the President or his/her designee within five (5) business days of receipt of the Step One denial.

Joint Exhibit 1; Union's Post Hearing Brief.

The CBA also provides as follows:

**5.2    <u>Time Limits</u>**
> By mutual agreement between the Union and the Employer, the time limits of any step of the grievance procedure may be extended and this extension must be confirmed in writing within the specified time limits. In the event either party fails to respond to the grievance within the time limits specified, the grievance shall be resolved on the basis of the opposing party's last stated position without setting precedent.

Joint Exhibit 1.

On May 31, 2016, Representative Vanier requested a date for the Step 2 meeting, offering June 9 or June 16, as options. Joint Exhibit 5. Not hearing a response, on June 13, 2016, he wrote to Vice President Pierson that the Employer had failed to provide a timely response after the parties' Step 1 meeting regarding the grievance. He asked that pursuant to Article 5.2 of the CBA, that the Employer implement the Union's last stated position as the resolution of the grievance. Joint Exhibit 6. Vice President Pierson testified that on June 2, 2016, during a conversation about another grievance, he asked Representatiave Vanier for different dates for the Step 2 meeting. Hearing Transcript, James Pierson testimony. Representative Vanier denied at hearing that this conversation occurred. Hearing Transcript, Casey Vanier testimony.

Vice President Pierson freely admits that he made an error by not recording

his request for Step 2 meetings dates in writing because of the pending birth of his son. He also thought he had an agreement with Representative Vanier for different meeting dates. Hearing Transcript, James Pierson testimony. The Employer contends that the failure to confirm the extension in writing was excusable neglect and justifiable reliance under these limited circumstances. Respondent's Post Arbitration Letter Brief.

After considering all of the evidence of record, I find that the Employer failed to meet the requirements of CBA Section 5.1 and 5.2, in that it failed to schedule a Step 2 meeting within five (5) business days and that although it claims that there was a verbal extension, the CBA requires that any extension be in writing. I find that Vice President Pierson's claim that he thought a verbal agreement was sufficient is contrary to the language in the CBA. The Union's claim that the Employer failed to comply with the grievance procedure is AFFIRMED. The grievance is GRANTED and shall be resolved on the basis of the opposing party's last stated position without setting precedent pursuant to the CBA.

## Issue

**Did the Employer violate the CBA when it failed and refused to allow bargaining unit member Andrew Fink to volunteer for bargaining unit member Robyn Hutson's mandated shift?**

## Analysis

The CBA provides in Article 10.10, Mandatory Assignment of Overtime, that the Employer can mandate employees to work overtime shifts, above and beyond their regular work week, with just 72 hours notice. Joint Exhibit 1. However, the Employer is able to resort to mandating overtime only after making efforts to fill the shift through all other means available to it, which pursuant to the CBA Article 11.6 includes using: 1. Part-time employees; 2. Full time employ-

Page 9

ees on the available list by seniority; 3. Any employee willing to accept the shift; and 4. Any means available to the Employer (i.e., non-bargaining unit management personnel). Joint Exhibit 1.

The Union argues that the record demonstrates, despite these four options available to the Employer before it could mandate employees to work overtime, that the Employer appears to be so severely short staffed that it regularly resorts to mandation and that mandation appears to be the only way that the Employer can staff its shifts each and every day. Union's Post Hearing Brief. At the Step 1 meeting, the Employer provided emails showing that the Employer issued approximately 250 mandations in the period of January 1, 2016 through April 5, 2016. Hearing Transcript, Casey Vanier testimony. The Union argues that this is an average of over two mandations per day and this is why the language in Article 10.10 is so significant to the Union. Union's Post Hearing Brief.

The facts are undisputed as follows:

On March 29, 2016 around 10pm, Ms. Hutson received an email informing her that she was being mandated to work on Saturday, April 2, 2016 for 12 hours, from 0900 to 2100, Shift 209. Joint Exhibit 7. Because Ms. Hutson had a personal commitment that day, she asked Mr. Fink if he could work her 209 shift on April 2, and he agreed. On March 31, 2016, at 7:24 am, Mr. Fink accessed the Employer's CrewScheduler system and submitted a bid for "Bid Item 209D" in order to take Hutson's mandated shift. Joint Exhibit 11. When he called Operations Manager Meader, to let him know that he had submitted the bid to cover Ms. Hutson's mandated shift, Operations Manager Meader talked Mr. Fink into volunteering to work another shift on April 2, that started at 10 am, instead of calling Ms. Hutson to inform her that she did not have to work the mandated shift because the Employer had been successful in filling the shift. Accordingly, on March 31, 2016, at 8:12 am, Mr. Fink accessed the Employer's Crew Scheduler system and submitted a bid for "Bid Item 210D". Joint Exhibit 11.

Chief Shop Steward Paulson provided uncontradicted testimony that after

he was contacted by Ms. Hutson, he talked to Operations Manager Meader who told him that there were other shifts/hours available on April 2, and that is why he was not going to let Mr. Fink take Ms. Hutson's mandated shift.  Hearing Transcript, Eric Paulson testimony.

After carefully reading Article 10.10(A)(1) of the CBA, I find that the Employer was obligated to continue to strive to fill Hutson's mandated shift up to 12 hours before its start; that the shift that Ms Hutson had been mandated to work, the 209 shift, was available on CrewScheduler for employees to bid on; that Mr. Fink was able to volunteer to fill Ms. Hutson's mandated shift by submitting his bid for it well in advance of the 12 hour cut off; that the Employer had no right under the CBA to prevent Mr. Fink from bidding on the 209 shift; and that the Employer had no right under the CBA to order him to bid on the 210 shift instead.  Under Article 11.6 of the CBA, an employee who volunteers to work is one of the options available to fill available hours/shifts.  The Employer contends that Article 10.9(A)(5) provides that "Shift trades may not result in uncovered hours."  The Employer argues that there is no good reason to infer that the parties intended to treat mandations any differently than shift trades and that while the Employer must strive to fill the mandation this does not mean that it must release the employee while leaving gaps in coverage.  The Employer also argues that there is no evidence to support a past practice theory where employees must be relieved automatically when they find a replacement and relieving an employee is the Employer's prerogative.  Respondent's Post Arbitration Letter Brief.

CBA Article 10.9 provides in pertinent part:

## 10.9    Shift Trades
A.    Shift Trades

All Full-time employees shall be entitled to trade shifts with other Full time Employees.  The Employer reserves the right to approve or deny shift trades in accordance with the following procedures:
1.    All Shift trades shall be submitted via the Zoll Crew Scheduler, or its future equivalent, five (5) calendar days prior to the date of the requested trade date.

2.      The Employer will respond in writing with an approval or denial to the Employee's trade request via Zoll Crew Scheduler, or its equiva lent within forty-eight (48) hours after the Employer receives the shift trade request.  Trades will be approved at the discretion of the Employer, such request shall not be unreasonably withheld.
    ...

4.      Shift trades shall not result in uncovered hours.

Joint Exhibit 1.

Ms. Hutson was sent a voice mail and subsequent email on March 29, 2016 at 9:22 pm, mandating her to work shift 209 from 0900-2100 out of the Vallejo station on April 2, 2016.  Joint Exhibit 7.  This was 84 hours advance notice.  In reviewing the Employer Exhibit 1, totaling 66 pages of mandations, the notices ranged from 72 to 96 hours notice before the mandation dates.  Employer Exhibit 1.  The Employer's argument that there is no good reason to infer that the parties intended to treat mandations any differently than shift trades makes no sense since mandations are only required to give 72 hours notice to an employee and the Shift Trades article requires the employee to submit a trade request five days prior to the requested trade date which is an impossibility regarding a 72 hour mandation.   Further, in mandations, part time employees and even non-bargaining unit management personnel are allowed to fill mandated shifts; where-as in Shift Trades, only full time employees can trade shifts with other full time employees.  Article 10.9, CBA; Joint Exhibit 1. Therefore, I find that Article 10.9 is in conflict with 10.10 and does not apply to mandations.

Although the Employer argues that it is the Employer's prerogative wheth-er to relieve a replacement, I find that in past practice the Employer has regularly allowed volunteer replacements in mandations.  I further find that per the uncon-tradicted bargaining history testimony by Representative Vanier the employees were allowed to find volunteers to cover their mandated shifts.  Operations Man-ager Meader testified that normally when an employee bids on a mandation, "we do release it".  Hearing Transcript, Brian Meader testimony.

Page 12

The Employer contends that Article 10.9 prohibits the Employer from allowing replacements for mandations if they result in uncovered hours. Since I have found that Article 10.9 does not to apply to mandations and since there is no wording in Article 10.10 prohibiting replacements causing uncovered hours, I find that there is no requirement that replacements for mandations cannot result in uncovered hours. Further, I do not agree with the Employer's argument that if it had allowed Mr. Fink to replace Ms. Hutson's mandated shift that would have caused uncovered hours. The other 2 shifts were already uncovered hours before Mr. Fink's request. I find that Mr. Fink's replacing Ms. Hutson's shift would not have caused uncovered hours.

Therefore, I find that when Mr. Fink volunteered to work Ms. Hutson's managed shift, the Employer had a contractual obligation to immediately relieve her from the mandation. I find that the Employer violated the CBA by failing and refusing to release Ms. Hutson from her mandation after Mr. Fink placed a bid to fill her mandated shift

The Employer contends that it had the right to refuse to release Ms. Hutson from her mandated shift after Mr Fink volunteered to work because the Employer still had more hours that it needed to fill the same day that Hutson had been mandated to work. Hearing Transcript, Brian Meader and Vice President Pierson testimonies. After careful examination of CBA Article 10.10, Mandatory Assignment of Overtime, I find no exception to the Employer's obligation to "not require the employee to work the mandated shift" once the "Employer is successful in filling the shift." Joint Exhibit 1. I further find that there is no evidence of record of any bargaining history or past practice to support the Employer's interpretation of Article 10.10 that if there were still more open hours to fill, a volunteer to fill a employee's mandated shift would not be approved. Further, there was no testimony that during the 2 years of negotiations of this CBA through proposals or discussions at the bargaining table that the Employer and the Union agreed to release a mandated employee but that it did not apply in instances

Page 13

where there are other open shifts or hours that the Employer did not yet fill, whether through mandation or any of the other means available to it in the CBA. Further, I found no evidence of any past practice of the Employer doing what it did in this case in order to keep Hutson from being released from the mandation.

Therefore, I find that the Employer had an obligation to continue to strive to fill Ms. Hutson's mandated shift up to 12 hours before the start of the shift and to release her from the mandated shift once the employer was successful in filling the shift. It is undisputed that Mr. Fink had volunteered for Ms. Hutson's mandated shift when he bid for it. I find that the failure and refusal to approve Mr. Fink's bid and release Ms. Hutson from the mandation was a violation of the CBA.

The Union's claim that the Employer violated the CBA when it failed and refused to allow bargaining unit member Mr. Fink to volunteer for bargaining unit member Ms. Hutson's mandated shift is AFFIRMED. The Union's claim that the Employer violated the CBA by failing and refusing to release Ms. Hutson from her mandation after Mr. Fink placed a bid to fill her mandated shift is AFFIRMED.

### Issue

**Did the Employer violate the CBA and established past practice when it ceased including shift identifiers in mandation emails to bargaining unit members?**

### Analysis

The Employer admitted that after March 31, 2016, it stopped the long established practice of including the shift identifier in all emails sent to the employees informing them of a mandated shift. The Employer also stated that it made this change because it wanted to mandate available hours, not shifts, yet both Operations Manager Meader and Vice President Pierson conceded that hours and shifts are the same. Hearing Transcript, Brian Meader and James Pierson testimonies.

Page 14

Therefore, I find that Articles 10.10 and 11.6 of the CBA apply equally to hours and shifts.

The Union claims that the net result of the Employer eliminating the shift identifier from the mandation emails is that it makes it very difficult, if not impossible, for mandated employees to find co-workers to bid on their mandated shifts, as Hutson did in this case when she asked Fink to bid on her mandated shift. Union's Post-Hearing Brief. Representative Vanier and Chief Shop Steward Paulson testified without contradiction that without the shift identifier an employee who has been mandated does not have the necessary information to have other employees go on CrewScheduler to find and bid on the mandated shift. Representative Vanier testified "Even when I worked there as an employee, mandated shifts were handed out as a shift, which allows you those transparencies to be able to know what your work is and what kind of work you're doing and people to bid on, those kinds of things". Hearing Transcript, Casey Vanier testimony. Chief Shop Steward Paulson testified that when a mandatory assignment is made right now without a shift identifier, there is no way for him to, using the CrewScheduler, bid on those hours. Hearing Transcript Eric Paulson testimonies.

I find that eliminating the shift identifier from the mandation emails and giving employees only the mandated hours, effectively limits the ability of employees who might place bids on the mandated shifts which affects the Employer's obligation under the CBA to release employees from mandated shifts. In effect, the Employer has shifted its burden of continuing "to strive to fill the mandated shift up to twelve (12) hours prior to the start of the shift requiring mandation" as per the CBA to the mandated employee who must now go to CrewScheduler to monitor whether any other employee has placed a bid on that mandated shift. Bargaining unit member Kendra Hayden had to do this on October 6, 2016 in order to be released from a mandated shift. Employer Exhibit 1. Chief Shop Steward Paulson also had to do this on June 16, 2016 in order to be released from a mandated shift. Hearing Transcript, Eric Paulson testimony; Employer Exhibit

Page 15

1.

Therefore, the Union's claim that the Employer violated the CBA and established past practice when it ceased including shift identifiers in mandation emails to bargaining unit members is AFFIRMED.

## Conclusion

After carefully examining all of the evidence of record, I find

(1) The Employer failed to comply with the grievance procedure in the CBA by failing to meet the time limits of Step 2 of the grievance procedure and then by failing to resolve the grievance based on the Union's last stated position;

(2) The Employer violated the CBA by failing and refusing to accept Mr. Fink's bid to take Ms. Hutson's mandated shift and by having him bid on another shift instead;

(3) The Employer violated the CBA by failing and refusing to release Ms. Hutson from her mandation after Mr. Fink placed a bid to fill her mandated shift;

(4) The Employer violated the CBA and established past practice by eliminating shift identifiers from emails informing employees of mandated shifts.

## DECISION

The Union's Grievance is GRANTED.

The Employer is ORDERED

1.    To cease and desist from any further violations of the CBA in the manners described above.

2.    To include shift identifiers in emails notifying employees of mandated shifts.  And,

3.    To send a clarifying memorandum to all bargaining unit members

notifying them that the Employer will resume including shift identifiers in emails notifying employees of mandated shifts.

Portia K. Igarashi
Arbitrator