1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MEDIC AMBULANCE SERVICES, INC.,        No.  2:17-cv-01859-KJM-KJN

12                  Plaintiff,

13           v.

14   UNITED EMS WORKERS, AFSCME,
     LOCAL 4911,
15
                    Defendant.
16   _____

17   MEDIC AMBULANCE SERVICES, INC.,        No.  2:17-cv-02037-KJM-KJN

18                  Plaintiff,

19           v.                             ORDER

20   UNITED EMS WORKERS, AFSCME,
     LOCAL 4911,
21
                    Defendant.
22

23

24           Two related cases involving the same parties, the same facts, and, for all relevant

25   purposes, the same briefing, are before the court.  The cases involve an employer and a labor

26   union's dispute about an arbitration award.   The employer moves to vacate the arbitration award

27   under the Labor Management Relations Act (LMRA).  The union moves to dismiss the

28   employer's petition to vacate and counter-moves for an order confirming the arbitration award.

                                              1

For reasons explained below, the court DENIES the motion to vacate and GRANTS the motion to confirm the arbitration award, resolving both cases.

## I.  FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

Plaintiff Medic Ambulance Services, Inc. ("Medic") is an emergency medical transport company. Petition to Vacate ("Vac. Pet."), ECF No. 1 ¶ 10.[1] Medic is the sole provider of ambulance services in Solano County, excluding the city of Vacaville. *Id.* Defendant United EMS Workers, AFSCME Local 4911 ("Union") represents paramedics and emergency medical technicians employed by Medic. *Id.* ¶ 11. The parties' relationship is governed by a collective bargaining agreement ("CBA"), effective April 16, 2014 through April 25, 2021. *See id.* ¶ 7; *see also* Vac. Pet. Ex. A, CBA, ECF No. 1 at 10-66.

The parties' dispute arises from Medic's assignment of a mandatory shift, a "mandation," to an employee. Motion to Vacate ("Vac. Mot."), ECF No. 4-1 at 6. Under CBA § 10.10, Medic may assign a mandatory shift when it "is unable to fill an available shift through any other means," but it must assign the shift in reverse seniority order, provide the mandated employee with a minimum of 72 hours' notice, "strive to fill the mandated shift up to twelve (12) hours" before the shift begins, and "immediately communicate with the mandated employee and not require the employee to work the mandated shift and not require the employee to work the mandated shift" if Medic is able to otherwise fill the shift. CBA § 10.10.A.1.[2]

On March 31, 2016, Medic assigned Union member Hutson to a mandatory shift. Vac. Mot. at 6. When another employee, Fink, volunteered to cover Hutson's mandated shift, Medic refused to release Hutson. *Id.* Medic believed a "mandated employee could be held to cover if there were any open hours during the time she had been mandated, even if she offered a replacement." *Id.* Immediately thereafter, Medic modified the email language it uses to notify

---

[1] Unless otherwise stated, all references to documents filed by the parties correspond to the docket in case number 2:17-cv-02037 KJM-KJN. Furthermore, all references to page numbers in the parties' briefing and exhibits correspond to ECF page numbers, not the briefs' internal pagination.

[2] Those sections of the CBA cited in this order are included in the Appendix attached hereto and incorporated herein.

employees they have been assigned a mandatory shift. *Id.* Instead of the "shift identifiers" Medic previously used in its notification emails, Medic provided notice of only the "hours that the employee was expected to work with no specific reference to a shift." *Id.* Medic contends its approach is permitted under CBA § 11.6, "Filling Open Shifts," which refers to "[a]vailable hours/shifts." *Id.*; *see* CBA § 11.6.A.

The CBA provides for a three-step grievance procedure to address "any dispute arising from the interpretation or application of any terms of [the CBA] and/or disputes concerning working conditions, benefits, or wages." CBA § 5.1.A. ("Grievance Procedure"); *see generally* CBA Article 5 ("Grievance and Arbitration"). The Union initiated "Step One" of the procedure on April 15, 2016 when it filed a grievance alleging:

> The Employer needs to follow the CBA when assigning Mandatory Shifts. On 4/1/16 it became evident the Employer decided to unilaterally implement a new interpretation of the applicable CBA article 10.10 for Mandatory Shifts, as well as the way in which the Shift is assigned /handed out, while also not allowing for found coverage, or another individual the opportunity to voluntarily bid on the Shift mandated to another employee.

Vac. Pet. ¶ 12; Vac. Mot. at 6-7. Medic denied the grievance and the parties were thus unable to resolve the dispute under Step One of the grievance procedure. Vac. Mot. at 7.

The Union then timely requested a "Step Two" meeting. *Id.* Medic was required to schedule a Step Two Meeting within five days of the Union's request. *Id.*; *see* CBA § 5.1 ("Step Two"). Under CBA § 5.2, the parties may extend "the time limits of any step of the grievance procedure" if "confirmed in writing within the specified time limits." CBA § 5.2 ("Time Limits"). Furthermore, "[i]n the event either party fails to respond to the grievance within the time limits specified, the grievance shall be resolved on the basis of the opposing party's last stated position without setting precedent." *Id.*

Medic did not timely schedule the Step Two meeting and did not obtain an extension in writing. Vac. Mot. at 7. At Arbitration, Medic argued it orally requested additional possible dates for a Step Two meeting, though the Union argued no such conversation ever occurred. Vac. Pet. Ex. 2, Award, ECF No. 1 at 75. Nearly two weeks after its request for a Step Two meeting, with no meeting scheduled, the Union requested Medic resolve the dispute based

3

on the Union's last stated position as provided in CBA § 5.2. *Id.* (citing arbitration joint exhibit).[3] The grievance apparently remained unresolved, though neither the parties nor the Award explain Medic's response to the Union's request to resolve the dispute based on the Union's last stated position. *See id.* The parties then proceeded to "Step Three" of the grievance procedure, in which "the grievance [is] referred to arbitration or Federal mediator." Vac. Pet. ¶ 13; *see* CBA § 5.1 ("Step Three"). In Step Three arbitration, "[t]he arbitrator's decision shall be final and binding on the Employer, the Union, and the employee(s) involved." CBA § 5.1 ("Step Three"). Additionally, CBA Step Three states the arbitrator "shall have no power to add to, or subtract from, or otherwise modify any provision of this Agreement." *Id.*; *see* Vac. Mot. at 16 n.2 (referring to § 5.1's "add to, or subtract from, or otherwise modify" language as a "zipper clause").

Arbitrator Portia Igarashi ("Arbitrator") presided over the parties' arbitration on November 21, 2016 and February 17, 2017. Vac. Pet. ¶ 13. The parties stipulated that the Arbitrator would determine one procedural question: "whether the union's grievance should be granted because the company failed to comply with the obligations under the grievance procedure of the CBA." Vac. Mot., Ex. A, Arb. Tr. Excerpts Vol. 2 ("Vol. 2 Arb. Tr."), ECF No. 4-2 at 6:4-10, 20-22. The parties were unable to reach a stipulation as to the specific merits questions to be decided by the Arbitrator. *Id.* at 6:20-23. The Union proposed the Arbitrator determine "whether the employer violated the CBA when they [*sic*] made changes to the practice/process regarding assignment of mandatory shifts; and if so what is the appropriate remedy." *Id.* at 6:12-18. Medic proposed "two separate issues on the merits: [(1)] May the employer mandate working hours/shifts where an employee who had bid and been awarded hours/shifts is known to be unavailable for said hours/shifts"; and (2) "may the employee, properly mandated to work hours/shifts, interfere with the employer's ability to fill hours/shifts." *Id.* at 7:1-5, 18-21. Unable to agree on the appropriate framing of the merits questions, the parties agreed they would "submit those issues and . . . defer to [the Arbitrator] to frame the ultimate issue for decision based on the

---

[3] Neither party provides the Joint Exhibits submitted to the Arbitrator and cited in her Award.

evidence presented." *Id.* at 7:22-8:1.  The parties also stipulated "that all the issues that have been offered are properly before the arbitrator for final and decision, all the questions [*sic*]." *Id.* at 8:2-7.

At arbitration, the Arbitrator addressed three issues.  First, she addressed, "Did the Employer fail to comply with the grievance procedure?"  Award at 74.  She found Medic "failed to meet the requirements of CBA Section 5.1 and 5.2, in that it failed to schedule a Step 2 meeting within five (5) business days" of the Union's timely escalation of its Step One grievance. *Id.* at 74-76.  The Arbitrator concluded her analysis of this section by deciding, "Union's claim that the Employer failed to comply with the grievance procedure is AFFIRMED.  The grievance is GRANTED and shall be resolved on the basis of the opposing party's last stated position without setting precedent pursuant to [§ 5.2 of] the CBA." *Id.* at 76.

The Arbitrator addressed the next issue, "Did the Employer violate the CBA when it failed and refused to allow bargaining unit member Andrew Fink to volunteer for bargaining unit member Robyn Hutson's mandated shift?" *Id.* at 76.  After analyzing and interpreting CBA §§ 10.9, 10.10 and 11.6 in light of the record before her, *see id.* at 76-81, the Arbitrator affirmed the Union's claims "the Employer violated the CBA when it failed and refused to allow . . . Fink to volunteer for . . . Hutson's mandated shift" and "by failing and refusing to release Ms. Hutson from her mandation after Mr. Fink placed a bid to file her mandated shift," *id.* at 81.  The Arbitrator framed the next issue as, "Did the Employer violate the CBA and established past practice when it ceased including shift identifiers in mandation emails to bargaining unit members?" *Id.* at 81.  The Arbitrator again analyzed CBA language and determined Medic was required to include shift identifiers in its email notices to employees assigning mandated shifts. *Id.* at 82-83.  In reaching this decision, the Arbitrator relied in part on Medic's "long established practice of including the shift identifier in all emails sent to the employees informing them of a mandated shift." *Id.* at 81.  She also cited the testimony of Medic agents "conced[ing] that hours and shifts are the same thing" and discussed the purpose of including shift identifiers in notification emails and the consequences of eliminating shift identifiers from those emails. *Id.* at 82.

On June 11, 2017, the Arbitrator issued her written decision and award. Vac. Pet. ¶ 14; Award. In her Award, the Arbitrator granted the Union's grievance in its entirety, concluding:

> (1) The Employer failed to comply with the grievance procedure in the CBA by failing to meet the time limits of Step 2 of the grievance procedure and then by failing to resolve the grievance based on the Union's last stated position;
>
> (2) The Employer violated the CBA by failing and refusing to accept Mr. Fink's bid to take Ms. Hutson's mandated shift and by having him bid on another shift instead;
>
> (3) The Employer violated the CBA by failing and refusing to release Ms. Hutson from her mandation after Mr. Fink placed a bid to fill her mandated shift;
>
> (4) The Employer violated the CBA and established past practice by eliminating shift identifiers from emails informing employees of mandated shifts.

Award at 83. The Arbitrator then ordered Medic:

> 1. To cease and desist from any further violations of the CBA in the manners described [in the Award].
>
> 2. To include shift identifiers in emails notifying employees of mandated shifts. And,
>
> 3. To send a clarifying memorandum to all bargaining unit members notifying them that the Employer will resume including shift identifiers in emails notifying employees of mandated shifts.

*Id.* at 83-84.

On September 7, 2017, Medic filed a petition to vacate the Award in this court. *See* Vacate Pet. Medic's petition included the parties' CBA and the Arbitrator's Award as exhibits. *See id.* at 9-84. On September 14, 2017, after difficulty serving Union, Medic "filed an identical Petition in the Solano County Superior Court of California [Case No. FCS-049579] to take advantage of the longer state deadline for service." *See* Medic Reply, ECF No. 13 at 5. The Union removed the state court case to this court. Case No. 2:17-cv-02037 KJM-KJN (hereinafter

/////

6

"17-2037 Action"), Removal Not., ECF No. 1.  On October 6, 2017, following the Union's notice of related cases, ECF No. 6, the court filed an order relating the two cases.  ECF No. 10.[4]

Medic filed a motion to vacate the arbitration award on September 9, 2017.  Vac. Mot.  Medic attached relevant excerpts from the arbitration proceedings.  Vol. 2 Arb. Tr.; Vac. Mot., Ex. B ("Vol. 1 Arb. Tr."), ECF No. 4-2 at 11-16.  On October 4, 2017, the Union filed an opposition to Medic's motion to vacate.  Opp'n, ECF No. 7.  The opposition consists of a single paragraph incorporating the Union's simultaneously filed motion to dismiss, styled "motion to dismiss petition to vacate arbitration award and counter motion to confirm arbitration award." *See* MTD, ECF No. 8.  Medic filed a "reply" to the Union's motion to dismiss and counter-motion to confirm.  Medic Reply.  The Union then filed a reply in support of its motion to dismiss the petition and confirm the Award.  Union Reply, ECF No. 14.  The court submitted the motions without hearing, Nov. 13, 2017 Min. Order, ECF No. 16, and resolves them here.

II.      LEGAL STANDARD

Section 301 of the Labor Management Relations Act ("LMRA") grants district courts the authority to enforce or vacate a final arbitration award.  29 U.S.C. § 185;[11] *Sprewell v. Golden State Warriors*, 266 F.3d 979, 986 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).  "Because of the centrality of the arbitration process to stable collective bargaining relationships, courts reviewing labor arbitration awards afford a 'nearly unparalleled degree of deference' to the arbitrator's decision." *Sw. Reg'l Council of*

---

[4] The related case order was filed as ECF No. 8 in the 17-2037 Action.  For all party filings referred to in this order, the parties filed substantively identical documents in the 17-2037 Action, *see* ECF Nos. 1, 5, 8, 11, 14-15, except Union did not file an opposition to Medic's motion to vacate in that action.

[11] Section 301 provides, in pertinent part:

> Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

7

*Carpenters v. Drywall Dynamics, Inc.* ("*Drywall Dynamics*"), 823 F.3d 524, 530 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 829 (2017) (quoting *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers* ("*Stead Motors*"), 886 F.2d 1200, 1204-05 (9th Cir. 1989) (en banc)). The court thus plays a "limited role . . . in reviewing labor arbitration awards," *id.* at 527, and owes great "deference [] both to the arbitrator's interpretation of the parties' agreement and to his findings of fact," *id.* at 530 (citation omitted).

By entering into an arbitration agreement, the parties bargained for an arbitrator, not a court, to act as factfinder. *Id.* Accordingly, the reviewing court will not disregard or supplement an arbitrator's "silly" or erroneous factfinding. *Id.* (citing *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.* ("*Misco*"), 484 U.S. 29, 39 (1987)). Furthermore, where parties authorize the arbitrator to interpret and give meaning to their agreement, *id.*, and the court will uphold the arbitrator's interpretation of the agreement "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Id.* at 531 (quoting *Misco*, 484 U.S. at 38 ) (internal quotation marks omitted); *see Stead Motors*, 886 F.2d at 1205 ("Since the labor arbitrator is designed to function in essence as the parties' surrogate, he cannot 'misinterpret' a collective bargaining agreement."). The same holds true even if the reviewing court "is convinced [the arbitrator] committed serious error." *Drywall Dynamics*, 823 F.3d at 531 (quoting *Misco*, 484 U.S. at 38). In addition, the reviewing court accords "an arbitrator's interpretation of the scope of the issue submitted to him . . . the same deference accorded his interpretation of the collective bargaining agreement." *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir. 1989); *Misco*, 484 U.S. at 40 ("[W]hen the subject matter of a dispute is arbitrable, 'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.").

A court may vacate a labor arbitration award under four "limited circumstances":

> when the award does not draw its essence from the collective bargaining agreement and the arbitrator is dispensing his own brand of industrial justice; (2) where the arbitrator exceeds the boundaries

*/////*

of the issues submitted to him; (3) when the award is contrary to public policy; or (4) when the award is procured by fraud.

*Drywall Dynamics*, 823 F.3d at 530 (quoting *S. Cal. Gas Co. v. Util. Workers Union of Am., Local 132, AFL–CIO*, 265 F.3d 787, 792–93 (9th Cir. 2001)).

III.    DISCUSSION

    A.    Procedural Issues

       "In response to a complaint to vacate an arbitration award, a party may simultaneously move to dismiss under Rule 12(b)(6) and move to confirm the award." *Eagle Sys. & Servs., Inc. v. Int'l Ass'n of Machinists*, No. 2:16-CV-02077-JAM-EFB, 2016 WL 7324753, at *2 (E.D. Cal. Dec. 16, 2016) (citing *K&M Installation, Inc. v. United Bhd. of Carpenters, Local 45*, No. 15-cv-05265, 2016 WL 1559712, at *1 (N.D. Cal. Apr. 18, 2016)).  Despite the assortment of briefs currently before the court, the parties do not dispute the material facts underlying their dispute; fundamentally, they ask the court only to review the Award and either vacate it or confirm it.  Medic does not object to the Union's motion to dismiss and counter-motion to confirm the Award as procedurally improper.  Furthermore, Medic had an opportunity to defend against the Union's motion to dismiss and counter-motion to confirm the Award.  *See id.* (quoting *K&M Installation, Inc.,* 2016 WL 1559712, at *1).  While Medic did not file an opposition to the Union's motion and counter-motion, but instead filed a "reply" to those motions, *see* Medic Reply, Medic's reply appears to function as both an opposition to the Union's motions and a reply to Medic's motion to vacate.   Finally, the court is able to resolve the legal questions presented in the parties' motions based on the pleadings and the record as a whole, which contains the CBA, the Award, and relevant excerpts from the arbitration transcripts.  *See id.* (same).  Accordingly, the court may properly consider the merits of the parties' motions.

    B.    Timeliness of Medic's Petition

       The Union contends Medic's motion is untimely under § 12 of the Federal Arbitration Act.  *See* 9 U.S.C. § 12.  Section 12 provides, in relevant part, "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."  *Id.*  Here, the Arbitrator filed her award on

June 11, 2017, Pet. ¶ 14, and Medic served its petition to vacate the award on the Union on September 13, 2017, MTD at 9. In other words, Medic served the Union two days after the FAA's deadline for service passed. *See* 9 U.S.C. § 12.

Medic counters that service was timely under the California Arbitration Act ("CAA"), which requires service of a petition within 100 days of service of a signed arbitration award. Medic Reply at 5; Cal. Civ. Proc. § 1288 ("A petition to vacate an award or to correct an award shall be served and filed not later than 100 days after the date of the service of a signed copy of the award on the petitioner."). Alternatively, Medic urges the court to extend the FAA's service deadline because the Union was "impracticable to serve." *See* Medic Reply at 4-5; *see also* Suppl. Decl. of Jordan, ECF No. 13-1 and Exs. A-E thereto (explaining and documenting Medic's unsuccessful efforts to serve the Union within 90 days of the Award).

As the Union concedes, "[t]he only reported case in the Ninth Circuit regarding the appropriate statute of limitations" for vacating an arbitration award concerning a collective bargaining agreement "applied the one-hundred-day statute of limitations under the [CAA section 1288]." MTD at 20 (citing *San Diego Cty. Dist. Council of Carpenters of United Bhd. of Carpenters & Joiners of Am. v. Cory*, 685 F.2d 1137, 1142 (9th Cir. 1982) ("In the absence of evidence that the California limitation period subverts the aims of national labor policy, we conclude that the 100-day California limitation period should apply . . . ."). The Union argues, however, that the Supreme Court and Ninth Circuit decisions following *Cory* "have applied the FAA to cases arising out of collective bargaining agreements" and thus urges the court to apply the FAA, and not the CAA, statute of limitations in recognition of the "evolution of the law." MTD at 2; *see, e.g.*, *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287 (2010), *aff'g in part, rev'g in part,* 546 F.3d 1169 (9th Cir. 2008).

Because the Union has not identified authority "supplant[ing] the Ninth Circuit's longstanding law that petitions to vacate under section 301 are governed by the CAA's one-hundred day statute of limitations," the court applies the CAA's statute of limitations. *See Sheedy Drayage Co. v. Teamsters Union Local No. 2785*, No. C-12-6204 EMC, 2013 WL 791886, at *5 (N.D. Cal. Mar. 4, 2013).

C.      Vacatur and Confirmation of the Award

Medic contends the Arbitrator ignored the CBA's plain language when she (1) issued a precedential Award, Vac. Mot. at 12-15, and (2) relied on the parties' past practices in reaching her decision, *id.* at 15-17. On both fronts, Medic argues the Arbitrator impermissibly dispensed her own brand of industrial justice and issued an award that does not draw its essence from the CBA. *See generally id.*; *see also* Pet. ¶¶ 17-23.[12]

"An award draws its essence from the CBA when it is based on language in the CBA." *SFIC Properties, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 94, Local Lodge 311*, 103 F.3d 923, 925 (9th Cir. 1996) (citing *Stead Motors*, 886 F.2d at 1205 n.6). An arbitration award fails to "draw its essence" from a bargaining agreement when "the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.'" *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (alteration in original) (citation omitted). This narrow exception is generally reserved to "those egregious cases in which a court determines that the arbitrator's award ignored the plain language of the contract, that he manifestly disregarded the contours of the bargain expressed in outline by the collective bargaining agreement." *Stead Motors*, 886 F.2d at 1205 n.6 (internal citations omitted). "[A]n arbitrator has no authority to ignore the plain language of a collective bargaining agreement that limits the scope of his authority." *Hawaii Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1181 (9th Cir. 2001); *see Misco*, 484 U.S. at 40-41 (noting parties may expressly limit arbitrator's discretion and "set [] ground rules for the arbitration process"). Thus, "[t]he violation of an express and explicit restriction on the

/////

---

[12] The Union argues that Medic's petition and motion to vacate the arbitration award is governed by § 301 of the LMRA, as well as the FAA. MTD at 17-20. Nowhere in its petition or briefing does Medic clearly invoke FAA grounds for vacatur. Accordingly, the court does not separately address whether vacatur is appropriate under the FAA. Moreover, in light of the extremely deferential review of an arbitrator's award accorded under the FAA, the result would not change even if the court were to consider FAA grounds for vacatur. *See, e.g.*, *Matter of Arbitration Between Perrin, Bernard, Supowitz, Inc. v. Teamsters Union Local No. 63*, No. CV 14-2047-JFW (EX), 2014 WL 12570166, at *3 (C.D. Cal. July 8, 2014).

arbitrator's power cannot be a plausible interpretation" of the CBA. *Federated Employers of Nevada, Inc. v. Teamsters Local No. 631*, 600 F.2d 1263, 1265 (9th Cir. 1979).

### 1. Issuing a Precedential Award

Medic contends that once the Arbitrator determined Medic did not "respond to [Union's Step 2] grievance within the time limits specified," the plain language of CBA § 5.2 required the Arbitrator to resolve the parties' dispute "on the basis of the opposing party's last stated position without setting precedent" rather than issuing a precedential award. Vac. Pet. ¶¶ 14-16; Vac. Mot. at 13-14. Medic further argues the Arbitrator's Award violated CBA § 5.1 because the Arbitrator impermissibly "subtract[ed]" § 5.2's "without setting precedent" language. Vac. Pet. ¶¶ 17-19; Vac. Mot. at 14-15. Finally, Medic contends the Award should be vacated because the parties did not "waive" the "without setting precedent" language in a signed writing, as required under CBA § 25.3. Vac. Mot. at 14-15.

This court must determine "simply whether the arbitrator's decision *concerns* construction of the contract, not [conduct] an evaluation of the merits of that construction." *See Drywall Dynamics*, 823 F.3d at 532 (emphasis in original) (citation and internal quotation marks omitted). Here, the Arbitrator determined that Medic violated CBA §§ 5.1 and 5.2 after reviewing the CBA's language and applying it to the facts in the record before her. *See* Award at 75-76. For example, the Arbitrator explained:

> After considering all of the evidence of record, I find that the Employer failed to meet the requirements of CBA Section 5.1 and 5.2, in that it failed to schedule a Step 2 meeting within five (5) business days and that although it claims that there was a verbal extension, the CBA requires that any extension be in writing. I find that [Medic] Vice President Pierson's claim that he thought a verbal agreement was sufficient is contrary to the language in the CBA.

Award at 76. As this explanation demonstrates, the Arbitrator's Award concerned a construction of CBA § 5.2. *See Drywall Dynamics*, 822 F.3d at 532. Nonetheless, Medic argues that the Arbitrator merely invoked CBA § 5.2's "without setting precedent" language, and "just ignored" its "unambiguous" mandate, thus depriving the parties' of their "bargained for [] limited remedy." *See* Vac. Mot. at 13. In other words, Medic asks the court to find that although the Arbitrator construed the CBA, she ignored a CBA provision expressly limiting her power.

12

The Arbitrator's analysis of the "last stated position . . . without setting precedent" language is sparing. *See, e.g.*, Award at 75 (citing CBA § 5.2 in its entirety); *id.* at 76 (affirming the Union's claim Medic failed to comply with grievance procedure, granting the grievance and determining it "shall be resolved on the basis of the opposing party's last stated position without setting precedent pursuant to the CBA"). But in light of the highly deferential review accorded to the Arbitrator's interpretation of the CBA, Medic does not raise a valid ground for vacatur. Rather, because the court cannot conclude the "without setting precedent" language is binding on the Arbitrator, it cannot conclude she exceeded her authority in reaching the merits and issuing a precedential award. *Cf. Enter. Wheel & Car Corp.*, 363 U.S. at 597 (a labor arbitrator is expected "to bring his informed judgment to bear in order to reach a fair solution of a problem. . . . especially [] when it comes to formulating remedies").

The CBA's "last stated position . . . without setting precedent" language, *see* CBA § 5.2, is not an "unambiguous and mandatory" restriction on the arbitrator's authority and its language does not "ensure that the parties' intent [to limit her authority] is clearly understood." *See Federated Employers of Nevada, Inc*, 600 F.2d at 1264-65 ((holding vacatur is appropriate where an arbitrator's award cannot be reconciled with "express restrictions on the arbitrator's power")). For example, vacatur was proper where an arbitrator adopted a modified version of a party's last offer despite the CBA's express requirement that "in issuing his findings [the arbitrator] must select as his award either the last offer made by the Employers or the last offer made by the Union at the conclusion of negotiations . . . with no modification or compromise in any fashion." *Id.* at 1264. Similarly, an arbitrator clearly exceeded her authority in relying on the parties' past practices despite a CBA provision stating, "jurisdiction shall not give the arbitrator authority to supplement or modify this Agreement by reference to any practice or custom or common law of the shop." *Los Angeles Times Commc'ns v. Graphic Commc'ns Conference Int'l Bhd. of Teamsters*, No. CV13-06192 RGK (RZX), 2013 WL 12139835, at *2-*6 (C.D. Cal. Oct. 8, 2013).

Here, by contrast, the CBA does not clearly confine the arbitrator's role to implementing the parties' "last stated position . . . without setting precedent" and the court cannot

13

conclude "the parties' intent is clearly understood" to so confine the Arbitrator. *See Federated Employers of Nevada, Inc*, 600 F.2d at 1265. As noted above, the Arbitrator clearly examined CBA § 5.2, and she ultimately concluded that "[Medic] failed to comply with the grievance procedure . . . by failing to resolve the grievance based on the Union's last stated position." Award at 83. This finding suggests the Arbitrator read CBA § 5.2 as governing the parties' resolution of a dispute following a timing error, not a limitation on her power to resolve such a dispute on the merits. Such a reading is plausible, as § 5.2 does not refer expressly to arbitration or an arbitrator's power. Further, because § 5.2 plausibly applies only to the parties, the court cannot find the Arbitrator "subtract[ed] from" the CBA when she issued an Award that did not simply resolve the grievance on the basis of the Union's last stated position. *See* CBA § 5.1 (providing the Arbitrator may not "add to, subtract from, or otherwise modify any provision of this Agreement").

Rather than expressly confining the Arbitrator's authority, § 5.2 appears to be aimed at providing the parties themselves with a quick and efficient de-escalation and resolution procedure when "either party fails to respond to the grievance within the time limits specified." *See* CBA § 5.2. Critically, when Medic did not timely schedule the Step Two meeting, the Union invoked § 5.2 and requested Medic resolve the dispute based on the Union's last stated position. *See* Award at 75. But Medic apparently declined to resolve the dispute under § 5.2 at Step Two. *See id.* Instead, the parties' self-mediation efforts ceased and the unresolved merits of the dispute were advanced to Step Three of the grievance procedure. Medic effectively waived its right to insist on a non-precedential resolution at Step Two when it agreed to forwarding the merits of that dispute beyond Step Two.

To that end, when a labor arbitrator hears and considers the merits of a dispute involving an earlier unresolved timing error, the CBA does not clearly require the arbitrator's "final and binding" decision to ignore the parties' substantive merits arguments and simply resolve the dispute on the opposing parties' last stated position. *See* CBA § 5.1 (requiring arbitrator to issue a "final and binding" decision); *see also Enter. Wheel & Car Corp.*, 363 U.S. at 597 (the arbitrator "bring[s] his informed judgment to bear in order to reach a fair solution of a

problem. . . . especially [] when it comes to formulating remedies.").  To the contrary, Medic's proposed interpretation of § 5.2 would countenance inefficiency and waste in light of the labor arbitrator's expertise and the costs incurred in arbitration.  *See* CBA § 5.1 (requiring parties to divide equally costs of arbitration).  Moreover, to the extent "the basis for the arbitrator's decision is ambiguous," the court will not second-guess her  interpretation of the contract when no clear error is evident.  *See Sheet Metal Workers Intern. Ass'n, Local No. 359, AFL-CIO v. Ariz. Mech. & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir. 1988); *see also Enter. Wheel*, 363 U.S. at 598 ("[M]ere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award.").

Finally, Medic's claim that CBA § 5.2 plainly prevented the Arbitrator from reaching the merits is unpersuasive in light of Medic's unambiguous assent to the Arbitrator's acting as a decision-maker on the merits.  *See* Vol. 2 Arb. Tr. at 7:1-5, 18-21 (submitting two merits questions for the Arbitrator to determine); *id.* at 8:2-7 (stipulating "that all issues that have been offered are properly before the arbitrator for final and decision, [and] all the questions").  "[A]n arbitrator's interpretation of the scope of the issue submitted to him is entitled to the same deference accorded his interpretation of the collective bargaining agreement"; the court therefore defers here to the Arbitrator's decision to proceed to the merits of the dispute presented to her. *See Pack Concrete, Inc.*, 866 F.2d at 285.  Indeed, in light of Medic's submission of merits questions in the arbitration proceedings, the Arbitrator could reasonably find she was authorized to reach the merits of the grievance.  *See Am United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 173 (9th Cir. 1995) ("Because the arbitrator only decided the issues agreed to by the parties, it cannot be said that the arbitrator exceeded her authority . . . .").

Accordingly, Medic has not raised a valid ground for vacatur.

2.     Past Practices

The Arbitrator determined that Medic violated the CBA and established past practice when it eliminated shift identifiers from mandation emails.  *See* Award at 81-83.  Medic argues that the Arbitrator exceeded her authority by relying on past practices, resulting in: (1) an

15

incorrect interpretation of CBA § 11.6, which "explicitly allows for mandation to be used for shifts and hours"; (2) elimination of "hours" from § 11.6's "hours/shifts" language, in violation of the CBA § 5.1's zipper clause; (3) violation of CBA § 25.3 (requiring a signed writing to modify CBA language, which Medic also refers to as a "zipper clause"); and (4) violation of CBA § 25.4 (providing the CBA is the complete agreement). Vac. Mot. at 16-17.

These arguments are unavailing. "[C]onsideration of past practices is generally valid absent language prohibiting such consideration." *Stationary Engineers Local 39, IUOE v. Kaiser Found. Hosps.*, No. 17-CV-03754-JCS, 2017 WL 3977382, at *11 (N.D. Cal. Sept. 11, 2017) (citing *Drywall Dynamics*, 823 F.3d at 533) (finding district court owed deference to arbitrator's "decisions on the parties' agreements, both as written and informed by past practice"). Medic acknowledges in reply that its opening brief omitted citation to "binding and persuasive precedent in this Circuit [that] establishes that Arbitrator's [*sic*] may use past practice" in interpreting a CBA. Medic Reply at 6-7. Rather than conceding the point, however, Medic argues it presents a novel argument here because the Ninth Circuit has not addressed whether "an Arbitrator exceeds their [*sic*] authority by using past practice while ignoring the plain language of both a zipper clause and no modification clause . . . ." *Id.* Medic does not explain why the existence of a no-modification clause should prevent an arbitrator from drawing on past practices while a zipper clause does not. Moreover, Medic's chief case, a Seventh Circuit decision titled *Anheuser-Busch, Inc.*, does not support Medic's position, as that case involved a zipper clause that expressly provided the CBA "supercede[d] . . . all practices not specifically preserved by the express provisions of this Agreement." *See Anheuser-Busch, Inc. v. Local Union No. 744*, 280 F.3d 1133, 1135 (7th Cir. 2002) (emphasis removed). The "zipper clause" at issue here does not prohibit an arbitrator from consulting past practices in interpreting the CBA. *See* CBA § 5.1. Likewise, although § 25.4 provides the CBA is the "Complete Agreement," it does not expressly prohibit consultation of past practices. *See* CBA § 25.4. In short, Medic presents no persuasive argument for departing from the general rule permitting consultation of past practices.

In addition, Medic's dissatisfaction with the Arbitrator's interpretation of the CBA's "shifts/hours" language is not a valid ground for vacatur. After reviewing arbitration

16

testimony and CBA §§ 10.10 and 11.6, the Arbitrator concluded Medic violated the CBA and past practice when it stopped using shift identifiers in its mandation emails.  Award at 81-83.  By referring only to hours in mandation emails, the Arbitrator found Medic "effectively limits the ability of the employees who might place bids on the mandated shifts which affects the Employer's obligation under the CBA to release employees from mandated shifts."  *Id.* at 82.  In other words, the Arbitrator explained Medic "shifted its burden of continuing 'to strive to fill the mandated shift up to twelve (12) hours prior to the start of the shift requiring mandation'. . . to the mandated employee who must now go to [Medic's scheduling program] to monitor whether any other employee has placed a bid on that mandated shift."  *Id.* (quoting CBA § 10.10.A.1). Although the Award requires Medic to include shift information in mandation emails, the Award did not, as Medic claims, "remove [Medic's] option to cover hours through mandation."  *See* Vac. Mot. at 16.  Rather, the Award requires Medic to follow its prior practices in sending mandation emails.  Regardless, in signing the CBA, the parties authorized the arbitrator to interpret their agreement and give its provisions meaning.  *See Drywall Dynamics, Inc.*, 823 F.3d at 530.  The Arbitrator, acting within the scope of her authority, did so here with respect to the "hours/shifts" provision and did not disregard the language of the CBA.  *See Misco*, 484 U.S. at 38; *see also* Award at 80-82.

       In short, this is not an "egregious case[] in which . . . the arbitrator's award ignored the plain language of the contract."  *See Stead Motors*, 886 F.2d at 1205 n.6.  The Arbitrator did not attribute an implausible meaning to the express language of the contract, *see United Food & Commercial Workers Union, Local 1119 v. United Markets, Inc.*, 784 F.2d 1413, 1415 (9th Cir. 1986), nor did she "disregard[] a specific contract provision to correct what [s]he perceived as an injustice," *see Pacific Motor Trucking Co. v. Automotive Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983) (per curiam).  The Arbitrator reviewed and construed the CBA and permissibly consulted past practices to resolve ambiguity with respect to the CBA's language.  Because the Arbitrator did not ignore the plain language of the CBA or exceed her authority in construing the CBA, this court may not supplant the Arbitrator's construction with its own.

/////

D.      ATTORNEYS' FEES

The Union moves for an award of attorneys' fees.  MTD at 22.  Under the "American Rule," a prevailing litigant typically cannot collect attorneys' fees absent statutory or contractual authorization.  *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975).  A court may assess attorneys' fees, however, "when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Id.* at 258-59 (internal citations and quotation marks omitted).  Bad faith may arise where a party's "obstinacy in granting [the other party's] clear legal rights necessitated resort to legal action with all the expense and delay entailed in litigation."  *See Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983) (internal quotation marks and citation omitted).  An award of attorneys' fees thus "satisfies a dual purpose—deterrence and compensation."  *Id.*  While the prospect of attorneys' fees "tends to deter frivolous dilatory tactics," the award also compensates the prevailing party "for the added expense of having to vindicate clearly established rights in court." *Id.* (internal quotation marks and citation omitted).

The twin goals of deterrence and compensation "are particularly apt in the context of labor arbitration."  *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983).  Because "[e]ngaging in frivolous dilatory tactics not only denies the individual prompt redress, it threatens the goal of industrial peace."  *Id.*  Thus, an award of attorneys' fees and reasonable costs serves the deterrence rationale "particularly [] where a party, without justification, refuses to abide by an arbitrator's award."  *Id.*

Although the court rejects Medic's challenge to the Award, "a challenge to an arbitral order on the ground that an arbitrator did not apply or misinterpreted the underlying contract does not necessarily constitute bad faith."  *See Pac. Gas & Elec. Co. v. SEIU Local 24/7*, 585 F. App'x 565 (9th Cir. 2014).  Medic advanced an ultimately unsuccessful argument, but the court cannot conclude Medic did so in bad faith.  *See id.*  Furthermore, although the Union raises valid concerns about Medic's omission of binding authority and filing a duplicative action in state court, the court likewise cannot conclude these acts were "frivolous dilatory tactics" that 'threaten[] the goal of industrial peace."  *See W. Indus. Maint., Inc.*, 707 F.2d at 428.  The court

nonetheless cautions Medic that future omissions of controlling legal precedent and the filing of duplicative litigation is likely not to be excused.

The Union's request for attorneys' fees is DENIED.

V.    <u>CONCLUSION</u>

For the reasons set forth above, the court DENIES Medic's motion to vacate, GRANTS the Union's motion to dismiss, GRANTS the Union's counter motion to confirm the arbitration award and DENIES Union's request for award of attorneys' fees.

The Clerk of the Court is directed to CLOSE these cases.

IT IS SO ORDERED.

DATED: March 13, 2018.

_____
UNITED STATES DISTRICT JUDGE

1

<u>APPENDIX</u>

2

3

## ARTICLE 5 - GREIVANCE AND ARBITRATION

4

<u>5.1</u>    <u>Grievance Procedure</u>

A.    The purpose of the grievance procedure is to facilitate a timely means of adjustment by the

5    Employer and the Union following a prompt investigation and thorough discussion of any dispute arising

from the interpretation or application of any terms of this agreement and/or disputes concerning working

6    conditions, benefits, or wages.

7

B.    Employees should attempt to resolve problems with their immediate supervisor prior to resorting to

8    the grievance procedure. Any agreement reached between a supervisor and an employee shall not be

considered to be a precedent setting agreement, with a copy provided to the Union at the time of

9    settlement.  No agreement between supervisor and employee shall in any way conflict with the terms and

provisions of this Agreement.

10

<u>Grievance Procedure Outline</u>

11    <u>Step One</u>

The Employee or the Union through its steward shall submit the Grievance in writing to the Administrator or

12    VP of Operations (VPO) within ten (10) business days of the occurrence giving rise to the grievance.

Within ten (10) business days of receipt of the grievance notice, a Step 1 meeting shall be scheduled.  The

13

14    ECF No. 1 at 17.

15

Administrator or VPO will give his/her answer in writing within ten (10) business days after such meeting.

16    Grievances resolved at this step shall not be precedent setting.

17

"Occurrence" is the date when the grievant learned of the event that is subject of the grievance or the

18    effective date of discipline or discharge.

19    "Meeting" shall be defined as either an in person meeting, or if mutually agreeable, via telephone

conference.

20

<u>Step Two</u>

21    If the procedure in Step One fails to resolve the grievance then, the grievance shall be submitted to the

President or his/her designee within five (5) business days of receipt of the Step One denial.  The parties

22    shall schedule a meeting within five (5) business days.  The President or his/her designee shall respond, in

writing, within five (5) business days from the date of the Step 2 meeting.

23

24    *Id.* at 18.

25    ///

26    ///

27    ///

28

**Step Three**

In case of failure of the parties to settle the grievance at Step Two the Union shall be entitled to request that the grievance be referred to arbitration or Federal Mediator within five (5) business days from the Unions receipt of the Employer's Step Two response and shall request a list of seven (7) arbitrators from the Federal Mediation and Conciliation Service (FMCS). Within ten (10) calendar days from the receipt of the list from FMCS, the parties shall select an arbitrator by the process of alternately striking names from such list. The party to strike such names shall be on a rotating basis. The arbitrator's decision shall be final and binding on the Employer, the Union, and the employee(s) involved. The cost of the arbitration shall be divided equally; the costs include the arbitrator's fees and expenses, hearing room cost, and the cost of a transcript.

The arbitrator or Federal Mediator shall have no power to add to, or subtract from, or otherwise modify any provision of this Agreement.

**5.2    Time Limits**

By mutual agreement between the Union and the Employer, the time limits of any step of the grievance procedure may be extended and this extension must be confirmed in writing within the specified time limits. In the event either party fails to respond to the grievance within the time limits specified, the grievance shall be resolved on the basis of the opposing party's last stated position without setting precedent.

**5.3    Participants**

The Employer agrees that the grievant shall be allowed to participate in any and all steps of the dispute procedure. The parties agree to exercise their best efforts to arrange grievance meetings which accommodate the schedule of all participants.

*Id.*

///

///

///

///

///

///

///

///

///

///

///

///

///

///

10.10 **Mandatory Assignment of Overtime**
A. Mandatory shifts
   1. When the Employer is unable to fill an available shift through any other means other than a mandatory assignment to an Employee, Mandatory Assignments will be made in reverse seniority order. Employees will be given a minimum of seventy two (72) hours notice prior to mandatory shift. The Employer shall continue to strive to fill the mandated shift up to twelve (12) hours prior to the start of the shift requiring mandation. In the event the Employer is successful in filling the shift the Employer shall immediately communicate with the mandated employee and not require the employee to work the mandated shift.

   2. When a Mandatory shift has been assigned, the Employee will be moved to the bottom of the list. If an Employee refuses to accept a mandatory shift assignment they will be subject to the following progressive discipline 1st offense = Written Warning 1st 2nd offense = One (1) day suspension, 3rd offense = Termination.

   3. A continuing database of employees assigned mandatory shifts will be maintained by the Employer and available for review at all times, to ensure reverse seniority is maintained by assignment with the following guidelines:

      i. No employee will be mandatoried more than one shift per two consecutive pay period block of time.
         1. 12-hour employees shall have a 12 hour break before and after the mandated shift;
         2. 24-hour employees mandated to a 12-hour unit shall have a 6-hour break prior to the 12 hour shift.
      ii. An employee cannot be assigned a mandatory shift that will interfere with his their regular scheduled shift.

If an Employee must refuse a mandatory shift assignment due to an extenuating circumstance the Employee must provide documentation of said circumstance to the Employer and at the sole discretion of the Employer may pardon employee from discipline. A refusal will not exclude the employee from mandatory shift assignment rotation.

*Id.* at 30.


11.6 **Filling Open Shifts**
A. Available hours/shifts shall be defined as those hours/shifts, which are open.
   Available hours filled as follows:

   1. Part-time employees;
   2. Full time employees on the available list by seniority;
   3. Any employee willing to accept the shift;
   4. Any means available to the Employer (i.e., non-bargaining unit management personnel);
   5. Mandatory call back in reversed order of seniority.

B. Availability schedules shall be submitted in accordance with the established practice.

*Id.* at 32.

///

22

### 25.3 Modifications to the Agreement

No addition to, alteration, modification, or waiver of any term, provision, covenant or condition or restriction in this agreement shall be valid, binding or of any force or effect unless mutually agreed to, in writing, by the Employer and the Union.

### 25.4 Complete Agreement

This Agreement sets forth the parties' agreement and understanding with respect to the matters referred to herein. The parties acknowledge that during the negotiations which resulted in this Agreement, each party had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.

Nothing contained herein shall prevent the parties, by mutual agreement, from negotiating on any subject matter, nor will it void any specific provisions in this Agreement that expressly provide for bargaining.

*Id.* at 46.